**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RAYANNE REGMUND, GLORIA JANSSEN, MICHAEL NEWBERRY and CAROL NEWBERRY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TALISMAN ENERGY USA, INC.<br><br>Defendant. | Civil Action No.:<br><br>Class Action<br><br>JURY TRIAL DEMANDED<br><br>Electronically Filed |

**FIRST AMENDED COMPLAINT – CLASS ACTION**

Rayanne Regmund, Gloria Janssen , Michael Newberry and Carol Newberry, (collectively hereinafter "Plaintiffs") by and through their undersigned counsel, on behalf of themselves and all others similarly situated, allege facts and claims upon their personal knowledge as to matters relating to themselves, and upon information and belief as to all other matters based upon the investigation of counsel, as follows:

## I.     INTRODUCTION

1.     This action is brought to remedy the systemic breach of contract by Talisman Energy USA, Inc. ("Talisman") in connection with Talisman's failure to properly calculate and pay Plaintiffs and Class Members contractually owed oil and gas royalties that uniformly required payment on the volume of production actually sold.  Instead, in late 2012 or early 2013, Talisman began paying oil and gas royalties to Plaintiffs and Class Members using estimated production and sales volumes initially resulting from Talisman's commingling of one royalty owner's well production with the production of other wells of differing ownership interest.  In late 2013,

Talisman compounded its error by estimating sales volumes from manipulated wellhead production data that Talisman arbitrarily and improperly reduced by 20% and then 30% (the "Skim").

2.      Talisman Energy USA, Inc., based in Warrendale, Pennsylvania, owns working interests in 2,900 oil and gas leases in the South Texas Eagle Ford shale play in which Plaintiffs and Class Members own mineral rights. From at least January 2013, Talisman Energy USA, Inc. has systematically failed and refused to pay Plaintiffs and Class Members the full royalties due and owing under certain oil and gas leases of mineral rights and assignments thereof.

3.      Based on Talisman's contract breaches, Plaintiffs seek, amongst other things, damages in the amounts improperly paid and/or withheld by Talisman due to the commingling, allocating and manipulation of both gross oil and gas production volumes and net sales volumes. Skim, declaratory relief to stop Talisman from withholding royalty payments in the future based on the Skim, and an accounting showing the precise method and amounts of royalty payments improperly paid by Talisman and owed to Plaintiffs. withheld.

4.      Plaintiff Rayanne Regmund is a resident of the State of Texas, residing in Kennedy Texas.  Ms. Regmund is a royalty interest mineral owner within the Talisman/Statoil Eagle Ford Shale Development Agreement acreage. On September 20, 2010, she entered into an oil and gas lease agreement with Enduring Resources, LLC for the development, production and sale of oil and gas from one acre located in Karnes County, Texas. See Exhibit A, Memorandum of Oil and Gas Lease evidencing Ms. Regmund's oil and gas lease.  Ms. Regmund's lease was subsequently assigned, including all rights and obligations thereto, in favor of Talisman Energy USA, Inc. and Statoil Texas Onshore Properties, LLC ("Statoil") as part of their joint development agreement. Pursuant to the assigned oil and gas lease agreement, Ms. Regmund was to receive a 1/5th royalty

2

payment on all the actual oil, gas and other hydrocarbons produced and sold. Plaintiff's oil and gas mineral interest was combined with other mineral interest owners and made part of an oil and gas producing well unit(s) which said unit(s) was then connected to and its gross production of oil and gas was commingled with the production of other wells of differing ownership interest. Since such time Plaintiff Regmund has received royalty payments based upon estimated sales of oil and gas as opposed to actual sales volumes as required by her lease. In 2013, Plaintiff Regmund was notified of a modification to the joint venture relationship between Talisman and Statoil such that Statoil would assume operations of wells, well operations and the development of new wells in Karnes County, Texas including Plaintiff Regmund's royalty interest governed by the September 20, 2010 lease agreement. Around the time Plaintiff Regmund was advised of the change in operators, Talisman, unilaterally and arbitrarily reduced Plaintiff Regmund's royalty payments through the manipulation of production volumes. Plaintiff Regmund had for some time received two royalty checks - one from Talisman and one from Statoil. However, the checks and accompanying check stubs were differently formatted between Talisman and Statoil using different time periods so the difference in royalty payments between the two companies for the same time period was not readily discernable from the checks and check stubs. As a result of Talisman's actions, Plaintiff Regmund has been harmed by the loss of royalty payments owed to her under her oil and gas lease agreement.

5.      Plaintiff Gloria Janssen is a resident of the State of Texas, residing in Runge, Texas. Ms. Janssen owns lease interests entitling her to royalty payments on the actual oil and gas produced and sold from wells operated by Talisman and Statoil. More specifically, Ms. Janssen represents Talisman Royalty Owner #2008809 and Statoil Royalty Owner # 103375. On June 21, 2011, Plaintiff Janssen entered into an oil and gas lease agreement with Talisman and Statoil for

the development, production and sale of oil and gas from approximately 4.292 acres over 10 tracts located in Karnes County, Texas. The lease agreement was subsequently amended on May 17, 2012 to increase the acreage to 4.35815397 involving 11 tracts. The lease was subsequently extended in May of 2014 to that acreage not made part of the Runge Town site Gas Unite #1. *See* Exhibit B, Memorandum of Oil and Gas Lease and associated Amendment(s) and Ratification(s). Pursuant to said oil and gas lease agreement, Plaintiff Janssen was to receive 1/5th royalty payment on all the actual oil, gas and other hydrocarbons produced and sold. Plaintiff Janssen's oil and gas mineral interest was combined with other mineral interest owners and made part of oil and gas producing well units including, but not limited to, the Wessendorff 4 - Slaughter (SA) B3H - royalty owner interest 0.051029; the Wessendorff 4 - Slaughter (SA) B2H - royalty owner interest 0.024483; Matula Gas Unit No. 1 - royalty owner interest 0.05074878 and the Runge Townsite GU. Those units were then connected to and the gross production of oil and gas was commingled with the production of other wells of differing ownership interest. Since such time Plaintiff Janssen has received royalty payments based upon estimated sales of oil and gas as opposed to actual sales volumes as required by her lease. In 2013, Plaintiff Janssen was notified of a modification to the joint venture relationship between Talisman and Statoil such that Statoil would assume operations of wells and the development of new wells in Karnes County, Texas including those involving her royalty interest under the lease agreement. Around the time Plaintiff Janssen was advised of the change in operators, Talisman, unilaterally and arbitrarily reduced Plaintiff Janssen's royalty payments through the manipulation of production volumes. Plaintiff Janssen had for some time received two royalty checks - one from Talisman and one from Statoil. However, the checks and accompanying check stubs were differently formatted between Talisman and Statoil using different time periods so the difference in royalty payments between the two companies for the

4

same time-period was not readily discernable from the checks and check stubs. As a result of Talisman's actions, Plaintiff Janssen has been harmed by the loss of royalty payments owed to her under her oil and gas lease agreements.

6.     Plaintiffs Michael Newberry and Carol Newberry are married and reside in the State of Texas, residing in Kennedy, Texas. Mr. and Mrs. Newberry jointly own oil and gas rights in property in the South Texas Eagle Ford shale play and granted lease interests therein entitling them to royalty payments from Talisman on the actual oil and gas produced and sold from wells operated by Talisman and Statoil. On June 1, 2007, September 16, 2009 and October 2012, Mr. Newberry or Mr. and Mrs. Newberry entered into oil and gas lease agreements and/or Revivor and Extension agreements with some combination of lessees - Enduring Resources, LLC, Allan Exploration, Talisman and Statoil – for the development, production and sale of oil and gas from four tracts involving 29.90, 32.60, 28.80, 32.00 acres located in Karnes County, Texas. *See* Exhibit C, Memorandum of Oil and Gas Leases.  All relevant and controlling lease agreements were ultimately assigned and/or owned by Talisman and Statoil under their joint development agreement.  Pursuant to Mr. and Mrs. Newberry's oil and gas lease agreements and assignments, they were to receive 1/5th royalty payment on all oil, gas and other hydrocarbons produced and sold. The Newberrys' oil and gas mineral interest were combined with other mineral interest owners and made part of oil and gas producing well units including but not limited to, the Evangeline GU 01-01, Uszynski - Furlow B3H, and Escondido Creek Evangeline. Those units were then connected to and the gross production of oil and gas was commingled with the production of other wells of differing ownership interest. Since such time Plaintiffs  Newberry have received  royalty payments based upon estimated sales of oil and gas as opposed to actual sales volumes as required by her lease.  In 2013, the Newberrys were notified of a modification to

5

the joint venture relationship between Talisman and Statoil such that Statoil would assume operations of wells and the development of new wells in Karnes County, Texas including those involving their royalty interest governed by the above lease agreements. Shortly being advised of the change in operators, Talisman, unilaterally and arbitrarily reduced the Newberrys' royalty payments through the manipulation of production volumes. Plaintiffs had for some time received two royalty checks - one from Talisman and one from Statoil. However, the checks and accompanying check stubs were differently formatted between Talisman and Statoil using different time periods so the difference in royalty payments between the two companies for the same time period was not readily discernable from the checks and check stubs. As a result of Talisman's actions, the Newberrys have been harmed by the loss of royalty payments owed to them under their oil and gas lease agreements.

7.    Defendant Talisman Energy USA, Inc. a Delaware corporation, is an oil and gas exploration and production company whose principal place of business is located at 50 Pennwood Place, Warrendale, Pennsylvania 15086. Talisman is a subsidiary of Calgary, Alberta based Talisman Energy, Inc., which was acquired by Spanish energy company Repsol S.A. on or about May 8, 2015.

## II.    JURISDICTION

8.    Jurisdiction of this Court is proper under 28 U.S.C. §1332 (d).   Diversity jurisdiction exists and Plaintiffs each reside in Texas, and Talisman is a Delaware corporation with its principal place of business in Warrendale, Pennsylvania.   The Class consists of citizens and residents of states across the country having oil and gas rights for property located in Texas.   The amount in controversy exceeds $5,000,000.00 for Representative Plaintiffs and members of the

Class collectively, exclusive of interests and costs, by virtue of the amount of royalties Talisman failed to pay pursuant to its contractual obligations, and by virtue of the declaratory relief sought.

### III.   VENUE

9.     Venue was proper within the judicial district for the Western District of Pennsylvania where this action was commenced pursuant to 28 U.S.C. § 1391 because Talisman's principal place of business is located in Warrendale, Pennsylvania in Allegheny County within this district, and a substantial part of the events giving rise to Plaintiffs' and the Class Members' claims occurred in this district. Pursuant to Talisman's Motion to Transfer Venue (Dkt. 29), the Pennsylvania Court transferred this case to the Southern District of Texas, Houston Division, finding venue is more appropriate within this judicial district where the wells at issue are located and certain of the Plaintiffs and Class Members reside.

### IV.   FACTS

10.     Plaintiffs and Class Members own royalty rights and interests arising from oil and gas leases in the South Texas Eagle Ford shale play ("Eagle Ford").  These royalty interest owners include individuals, partnerships, trusts, corporations and other entities residing both in Texas, and throughout the United States. Talisman is an upstream oil and gas production company; an indirect subsidiary of Calgary, Alberta-based Talisman Energy Inc., ("TEI") which was acquired for $13 Billion by an affiliate of the Spanish integrated energy company Repsol S.A. on May 8, 2015

11.     In Texas, gas and oil leases permit royalty payments to be calculated based on the amount of gas or oil as determined either at the wellhead or the amount that enters the pipeline for sale and may be based on production of oil and gas, or sales of the produced oil and gas.

12.     The production of oil, condensate and natural gas at a well site is measured daily at the wellhead by a meter.

13.     Pursuant to Texas oil and gas law, the operating entity is responsible for reporting all required well production data to Texas Comptroller of Public Accounts (hereinafter "Texas Comptroller"). Title 16, Tex. Nat. Res. Code.  Reports to the Texas Comptroller include both volumes sold and revenues received, by product reported.

14.     Texas law also requires that any entity paying oil and gas royalties must accompany the payment with a check stub from the payor containing details, *inter alia*, of well identification, volume of production, price, decimal interest (the royalty owner's share of production from the drilling unit), expense deductions and taxes. Tex. Nat. Res. Code §§91.501-91.502.  The required check stub detail is intended to allow the royalty recipient to verify that the payment accords with the payor's obligation under applicable leases.

15.     In 2010, Talisman entered the Texas oil and gas market and opened a Texas office whereby it acquired extraction rights under numerous oil and gas leases in the Eagle Ford shale including those owned by Plaintiffs and the Class Members. Talisman also entered into the South Texas Joint Development Agreement (the "Development Agreement"), which created a joint venture between Talisman and Statoil to explore, develop and produce oil and gas.  Statoil also owns extraction rights under numerous oil and gas leases in the Eagle Ford.

16.     The Development Agreement obligated the well operator to report all well production data to the non-operating partner in a manner consistent with and as required by the Texas Comptroller, so that both the operator and non-operating partner could comply with Texas law governing royalty payments, expenses, adjustments and deductions thereto and documentation including check stubs to mineral rights owners.

17.     Under the Development Agreement, Talisman and Statoil agreed to divide the oil and gas production on a 50-50 basis.  Talisman and Statoil sell their own share of the production, are required to report their half of the volumes to royalty owners, and must pay royalty owners based on the actual production volumes sold.

18.     Plaintiffs and Class Members are owners of the royalty rights for oil and gas leases in Eagle Ford that establish their rights to royalty payments and the amounts they are to be paid based on the actual volume of gas and oil produced and sold.  The Development Agreement did not change Plaintiffs or Class Members' rights to royalty payments based on the actual production volume of gas and oil produced and sold.

19.     Initially, Talisman acted as operator for all of the Eagle Ford joint venture acreage, with Statoil retaining a non-operating working interest.  As the operator of record, Talisman was responsible for reporting the oil and gas production to the Texas Rail Road Commission and state Comptroller.

20.     As the operator and joint venture partner with Statoil, Talisman began in late 2012 to commingle the gross production of oil, condensate and gas from various wells of differing ownership including Plaintiffs' wells, through the use of extensive gathering and treatment facilities referred to as Central Gathering Points, Central Deliver Points and/or Central Receipt Points.

21.     Talisman has admitted that when it entered the Texas oil and gas market, it did not have the capability to manage the complexities of the leases it was purchasing and entering into and its production accounting system was incapable of proper allocation of commingled oil and gas production and sales.

22.     Effective July 1, 2013, Talisman and Statoil modified their Development Agreement so as to divide responsibility for drilling and operating wells in the joint venture acreage, including those in which Plaintiffs and Class Members owned royalty interests.

23.     According to the Development Agreement modification effective July 1, 2013, Talisman continued operating wells within the western and central portion of the shared holdings, and Statoil agreed to operate the wells in the eastern portion of the shared. However, Talisman continues to market its own share of production and maintain a revenue accounting function to account for the revenues received from sales of production and allocate revenues back to each owner on a per-well basis.

24.     In December 2015, Statoil and Talisman further amended the Development Agreement to provide that Statoil now serves as operator for all wells within the joint venture acreage, with Talisman retaining a non-operating working interest.

25.     Unbeknownst to Plaintiffs and Class Members, Talisman's decision to commingle gross oil and gas production from wells of differing ownership interest created certain challenges when allocating the commingled sales of those production volumes back to the individual wells. Texas law requires that a "Commingler" identify each royalty owner's aliquot share of production commingled and sold with reasonable certainty.

26.     Talisman compounded its commingling and allocation problems by implementing a scheme to alter wellhead production data received from Statoil, reducing the measured volumes of gas and oil by an across the board (the "Skim"). Between the production months of June 2013 and March 2016, Talisman used gross production volumes of condensate reduced by as much as 30% to estimate net sales of condensate then improperly allocated those volumes back to the individual wells before paying royalty owners on the shrunken volumes.

27.    The issues with Talisman's commingling, allocating and shrinking were not readily apparent to or discoverable by royalty owners. While the Development Agreement required Talisman and Statoil to share production and pay royalties on a 50-50 basis, the information and format of Talisman's check stubs were different from the information and format of Statoil's check stubs and for production and production adjustments during different time periods than those reflected on Statoil's check stubs, it was difficult, if not impossible, for Plaintiffs to determine the net difference, let alone the reason for the net difference, in royalty payments.

28.    Talisman has admitted to reducing Plaintiffs' and Class Members' royalty payments based on "shrinkage.".   Talisman has also admitted that if it could not justify its lower production volume, it would be legally responsible to make additional royalty payments to royalty owners pursuant to their respective lease agreements.

29.    In response to royalty owner's questions regarding the difference in the royalty payments between Talisman and Statoil, Talisman explained away the Skim by contending that in transporting and marketing oil, certain volumes of condensate (light oil) do not qualify for royalty payments because they are lost to "shrinkage."

30.    In the oil and gas industry, shrinkage refers to the difference between production amounts produced at the wellhead and that which enters a pipeline for sale.  Shrinkage attributable to a given well is not a static percentage and there is no domestic oil industry standard or common practice which allows for application of a fixed shrinkage factor to estimate sales.  Moreover, based upon information and belief, Talisman's own personnel concluded. shrinkage, if applicable, could never approach the 20% Skim, and certainly never 30%.

31.    Any reduction of royalty payments under a mineral rights lease must be permitted by the lease contract and justified, either from actual measurement or established American

domestic oil industry standards. Plaintiffs' and Class Members' materially similar lease provisions require Talisman to pay on actual sales not estimated, commingled, allocated, shrunken or calculated net sales volumes as Talisman did here.

32.     Regardless of whether the production volume is measured at the well head, after separation or at the point of sale, under no circumstances do the applicable leases permit the aforementioned Skim.

33.     In employing the Skim for the purpose of shorting royalty payments to Plaintiffs and Class Members, Talisman engaged in actions that were arbitrary, capricious and in bad faith.

34.     Talisman has also arbitrarily manipulated production volumes and royalty payments from joint venture wells operated by Talisman and reported shrunken and improperly allocated net sales volumes to the Texas Rail Road Commission and State Comptroller.

35.     Plaintiffs have complained to Talisman about the discrepancies between royalty checks from Talisman and Statoil, but Talisman has offered only misleading explanations. Only after Plaintiffs filing of this suit did Talisman offer restitution to certain royalty owners for payment shortages attributable to the Skim.

## V.     EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

36.     Talisman arbitrarily and unilaterally manipulated royalty owner payments by estimating sales volumes through the shrinking of gross production volumes and improperly allocating commingled production and net sales volumes.

37.     Talisman intentionally concealed the actions herein described in the forgoing paragraphs to ensure the continuation of those activities and forestall legal action.

38.     Without access to the Development Agreement, well production, run sheets and gauge reports, and Talisman's sale and distribution agreements, Plaintiffs and Class members alike

would be both unable to determine the extent and nature of Talisman's wrongful conduct or the financial harm suffered as a result of such conduct. None of these documents critical to exposing Talisman's wrongful conduct were given to Plaintiffs or Class Members. Thus, Plaintiffs and Class Members were left with the check stubs that Talisman manipulated as their sole source of information. Moreover, Talisman did not simply disclose its commingling, allocating and estimating to Plaintiffs and Class Members. Rather, that information and Talisman's related misconduct only came to light when it was fist revealed by former Talisman employee(s) in or around February 2015.

39.   By its very nature, Talisman's activity, as alleged herein, was self-concealing. Plaintiffs had no knowledge of Talisman's deceitful conduct and could not have discovered same by the exercise of due diligence.

40.   As a result of Talisman's fraudulent concealment of its conduct, and the self-concealing nature of its acts, Plaintiffs assert the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiffs.

41.   Talisman is hereby equitably estopped from asserting that any otherwise applicable limitations period has run.

## VI.   THE DISCOVERY RULE

42.   Plaintiffs did not discover, nor should Plaintiffs have reasonably discovered, Talisman's wrongful conduct causing their injuries until Talisman's conduct was revealed by former Talisman employee(s) in or around February 2015.

43.   Plaintiffs did not discover, nor should Plaintiffs reasonably have discovered, (1) the injuries and (2) the identity of the person(s) whose wrongful conduct caused the injuries, until February 2015.

44.     The discovery rule applies to toll the statute of limitations as to all causes of action against Talisman and other responsible parties identified by discovery in this matter.

## VII.     CLASS ACTION ALLEGATIONS

45.     This action asserts claims on behalf of a class pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and (c)(4) as follows:

> All persons who, pursuant to an oil and gas lease within the Texas, Eagle Ford Shale, received between January 1, 2013 and June 1, 2016, royalty payments from Talisman attributable to production, including but not limited to, gas, oil, condensate and all hydrocarbons separated, extracted or manufactured from gas that was commingled with production from one or more other wells, and to whom Talisman paid such royalties using a volumetric allocation methodology of net production sold and/or estimated "shrunk" production volumes.

46.     Excluded from the Class are (i) Talisman and its employees, principals, affiliated entities, legal representatives, successors and assigns; and (ii) the judges to whom this action is assigned and any members of their immediate families.

47.     There are 3,957 potential members of the Class who are geographically dispersed throughout the United States.  Therefore, individual joinder of all members of the Class would be impractical.

48.     There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

49.     Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. The predominate legal and factual questions in this case include, but are not limited to:

> a.   Whether Talisman voluntarily commingled the gross oil and gas production of multiple wells with differing ownership interests;
>
> b.   Whether Talisman can identify with reasonable certainty each royalty owner's aliquot share of gross production and resulting net sales;

c. Whether Talisman improperly allocated net sales back to the individual wells in violation of industry standards and common practice:

d. Whether Talisman used an industry accepted standard or practice when it estimated nets sales of condensate by use of a common methodology to arbitrarily reduce production volumes of oil and gas;

e. Whether Talisman's application of a 20%-30% Skim in calculating royalties to Class Members was justified, either from actual measurement or established American domestic oil industry standards;

f. Whether Talisman breached the materially similar lease provisions of Plaintiffs and Class Member regarding the volumes for which royalty payments are made;

g. Whether the commingling, allocating and arbitrary shrinking of production volumes of oil and gas resulted in reduced royalty payments to Class Members;

h. Whether Talisman disclosed, accounted for and reported correctly to Plaintiffs and Class Members the volumes of oil and gas production on which it owed royalties;

i. Whether Talisman's commingling gross production, allocating net sales and use of the Skim violated its duties to Plaintiffs and Class Members to honestly account for and pay royalties;

j. Whether the check stubs furnished by Talisman with royalty payments complied with Texas law; and

k. The appropriate measure of damages, penalties, interest, equitable and/or declaratory relief.

50.     Although each class member's damages will have to be calculated individually, the calculation is one of simple mathematics and under well settled law, variances in the amount of damages of individual class members do not preclude class certification.

51.     Plaintiffs' claims are typical claims of the Class in that Plaintiffs have materially similar lease agreements as other members of the class entitling them to royalty payments from the gross production volume sold. Plaintiffs' claims are also not subject to any unique defenses. Plaintiffs, therefore, are no different in any relevant respect from any other Class member, and the relief sought is common to the Class.

52.     Plaintiffs are adequate representatives of the Class because they have no interests adverse to or in conflict with members of the Class they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation, and litigation regarding the rights of mineral owners.  Plaintiffs and their counsel will adequately protect the interests of the Class.

53.     Talisman has engaged in a pattern of misconduct common to the entire Class so that class-wide relief is appropriate.

54.     The common pattern of Talisman's misconduct and the common theories for redressing that misconduct make a class action superior to other available methods for fairly and efficiently adjudicating the underlying dispute. The damages suffered by each individual Class Member on balance are relatively small, while the burden and monetary expense needed to individually prosecute this case against Talisman is substantial.  Thus, it would be virtually impossible for Class Members individually to redress effectively the wrongs done to them. Moreover, even if Class Members could afford individual actions, a multitude of such individual actions still would not be preferable to class-wide litigation.

55.     By contrast, a class action presents far fewer litigation management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The class is readily definable and prosecution as a class action will eliminate the possibility of repetitious litigation while also providing redress for those claims that may be too small to warrant the expenses of individual, complex litigation. Also, or in the alternative, the Class may be certified because Talisman has acted or refused to act on grounds generally applicable to the Class, thereby making preliminary and final declaratory relief appropriate.

56.     In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, which would be dispositive of at least some of the issues and hence interests of the other members not party to the individual actions, would substantially impair or impede their ability to protect their interests, and would establish incompatible standards of conduct for the party opposing the Class.  A class action can determine the legality of Defendant's actions relative to all class members with judicial economy.

57.     Further, in the alternative, the Class may be maintained as a class action with respect to particular issues pursuant to Fed. R. Civ. P. 23(c)(4).

58.     All records concerning each of the leases, volumes of gas and oil production, and royalty payments from Talisman are in the possession and control of Talisman and its agents and are available through discovery.

### VIII.  CLAIMS

### COUNT 1
### BREACH OF CONTRACT

59.     Plaintiffs incorporate by reference all preceding paragraphs.

60.     Plaintiffs and Class Members executed valid and enforceable contracts in the form of oil and gas leases, directly or through assignments, with Talisman. (See Exhibits A-C).

61.     Plaintiffs, as parties to the leases and assignments, are the proper parties to enforce the terms of the relevant leases and assignments and have performed, or have substantially performed, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the relevant leases and assignments.

62.     Pursuant to the materially similar terms of Plaintiffs' and Class Members' applicable oil and gas leases, Talisman promised to make royalty payments based on the actual production volume of gas and oil sold.

63.     Plaintiffs and Class Members are, and have been, entitled to Talisman's performance of its obligations under the relevant leases and assignments to make royalty payments based on the actual production volume of gas and oil sold.

64.     Talisman materially breached the gas and oil leases applicable to Plaintiffs and Class Members by paying royalty owners based on estimated production volumes sold as a result of Talisman improperly allocating net sales from commingled production and applying the Skim to gross production volumes and thereby reducing the royalty payments owed to Plaintiffs and Class Members.

65.     Talisman has refused and continues to refuse to perform its obligations to pay Plaintiffs and Class Members royalty payments based on the actual production volumes of gas and oil sold as required by the applicable lease agreements.

66.     Plaintiffs presented their claims to Talisman, and as of the filing of this Complaint Talisman has not tendered the amounts owed to Plaintiffs or Class Members.

67.     Defendant has materially breached its contractual obligations to Plaintiff(s), including the express terms set out above in the Facts. Examples of such breaches include but are not limited to the following:

a.   Reducing production volumes of oil, or liquid or liquefiable hydrocarbons and/or natural gas produced from the relevant lands by approximately 20% - 30% without notice or contract support under the existing oil and gas lease contracts;

b.   Failing to pay the agreed royalty payments for oil or liquid or liquefiable hydrocarbons produced and sold from the relevant lands as provided for in their oil and gas lease;

    c.   Failing to pay royalties on all oil, condensate and gas produced and sold from the relevant lands as provided for in their oil and gas lease; and

    d.   Refusing to provide Plaintiffs, among other materials, relevant and related records and data pertaining to the production, transportation, sale, and marketing of the production from the relevant lands.

68.     As a direct and proximate cause of Talisman's contractual breaches, Plaintiffs and Class Members have been damaged for which they are entitled to recover actual damages, consequential damages, interest, penalties, attorneys' fees, and any other legal or equitable relief deemed appropriate by the Court.

## COUNT 2
## ACCOUNTING

69.     Plaintiffs incorporate by reference all preceding paragraphs.

70.     Damages alone will not compensate Plaintiffs and Class Members for their collective loss of royalty payments consistent with their oil and gas lease contracts; the facts and accounts presented are so complex that adequate relief may not be obtained at law; standard discovery procedures, such as requests for production, interrogatories, and subpoena *duces tecum*, may prove inadequate to provide Plaintiffs with the information sought regarding royalty payments.

71.     Plaintiffs and Class Members seek an accounting pursuant to the information required under Texas Natural Resources Code Section 91, *et seq*,- as follows:

    a.   For past and present monthly production volumes of oil, liquids, condensate, liquefied hydrocarbons and natural gas by well for Plaintiffs and Class Members as reported to the Texas Comptroller or other state or federal agency, to royalty owners by Talisman, as recorded by any third-party vendor contracted by Talisman to test, sample or record such volumes;

    b.   For past and present royalty payments made to Plaintiffs and Class Members on the production of oil, liquids, condensate, liquefied hydrocarbons and natural gas production volumes, and substances; and

    c.  For past and present deductions by category of expense or other deductions including but not limited to deductions for "shrinkage," and for past and present information supporting any deduction or expense from or to production volumes or royalty payments.

## COUNT 3
## UNJUST ENRICHMENT

72.    Plaintiffs incorporate by reference all preceding paragraphs. This Count is brought in the alternative.

73.    Talisman has been unjustly enriched as a result of the commingling, improperly allocating, shrinking and underpayment of royalties owed to Plaintiffs and Class Members as described herein.

74.    Plaintiffs and Class Members, in justice and fairness, are entitled to restitution of all underpayments of royalties caused by such wrongful acts and omissions which unjustly enriched Talisman, recovery of reasonable attorneys' fees, recovery of statutory penalties and interest as provided at Tex. Nat. Res. Code §§91.401 - 91.404, punitive damages and any and all other equitable relief deemed appropriate by the court.

## COUNT 4
## DECLARATORY JUDGMENT

75.    Plaintiffs incorporate by reference all preceding paragraphs.

76.    Plaintiffs and Class Members are entitled to a declaratory judgment: (a) declaring Talisman liable to Plaintiffs and Class Members for the wrongful acts, omissions, practices, and schemes described above, (b) ordering Talisman to provide complete and accurate check stub information, as required by Tex. Nat. Res. Code § 91.502, (c) granting Plaintiffs and Class Members such other or additional declaratory and/or injunctive relief relating to such wrongful acts, omissions, practices, and financial/accounting schemes as may be available under the law

and deemed appropriate by the Court, and/or (f) awarding attorneys' fees as provided for by contract or pursuant to Tex. Nat. Res. Code §91.406, and Tex. Civ. Prac. & Rem. Code 38.001 *et seq.*

## IX.    REQUEST FOR RELIEF AND PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other Class Members, request an award and relief as follows:

a.  An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs be appointed Class Representatives, and undersigned counsel be appointed Class Counsel;

b.  A determination that Talisman breached obligations owed to Plaintiffs and Class Members;

c.  A declaration and Order providing the other declaratory and injunctive relief requested throughout this Complaint;

d.  An Order requiring Talisman to provide an accounting of past and present royalty payments for Plaintiffs and Class Members;

e.  Actual and consequential damages in an amount to be determined at trial;

f.  Applicable statutory penalties for Claims for which they are available;

g.  Punitive damages for Claims for which they are available;

h.  Equitable and/or declaratory relief for Claims for which they are available;

i.  An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre-and post-judgment interest at the highest rate allowed by law;

j.  An order declaring that Talisman is financially responsible for notifying all Class Members of this action; and

k.  Such other and further relief as may be deemed necessary or appropriate.

## X.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: ___April 24, 2018___                    Respectfully submitted,

/s/ Bryan O. Blevins, Jr.
Bryan O. Blevins, Jr. (TX ADD)
**PROVOST★UMPHREY LAW FIRM, L.L.P.**
490 Park Street
P.O. Box 4905
Beaumont, Texas 77701
Phone: (409) 838-8858
Fax: (409) 813-8610
Email:  BBlevins@provostumphrey.com

W. Michael Hamilton (TN 10720)
**PROVOST★UMPHREY LAW FIRM, L.L.P.**
Hobbs Building, Suite 303
4205 Hillsboro Road
Nashville, TN 37215
Phone: (615) 297-1932
Fax: (615) 297-1986
Email:  MHamilton@provostumphrey.com

T. Ernest Freeman (TX 77056)
Stephen G. Scholl (TX ADD)
**THE FREEMAN LAW FIRM, P.C.**
1770 St. James Place, Suite 120
Houston, Texas 77056
Phone: (713) 973-1000
Fax: (713) 973-1004
Email:  ernest@thefreemanlawfirm.com
steve@thefreemanlawfirm.com

**FEINSTEIN DOYLE PAYNE
& KRAVEC, LLC**
/s/Joseph N. Kravec, Jr.
Joseph N. Kravec, Jr. (PA 68992)
Wyatt A. Lison (PA 90030)
429 Forbes Avenue, 17th Floor
Pittsburgh, PA 15219
Phone: (412) 281-8400
Fax: (412) 281-1007
Email:  jkravec@fdpklaw.com
wlison@fdpklaw.com