UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAYNNE REGMUND, et al. | § § § | CIVIL ACTION |
| Plaintiffs | § § | |
| v. | § § | NO. 4:16-cv-02960 |
| TALISMAN ENERGY USA, INC. | § § | |
| Defendant | § § | JUDGE KEITH P. ELLISON |

## <u>DELARATION OF MR. PETER D. HUDDLESTON, P.E.</u>

1. My name is Peter D. Huddleston. I am over the age of 21 and am competent to provide the expert opinions stated herein.

2. I am the Chairman and owner of Huddleston & Co., Inc. The business address of the company is 9805 Katy Freeway, Suite 500, Houston, Texas, 77024-1271. I have been employed by Huddleston & Co., Inc. since 1980.

3. I attended Texas A&M University and obtained a Bachelor of Science degree in Petroleum Engineering. I have over excess thirty-eight years of experience working as a petroleum engineer providing reservoir and economic evaluations for the petroleum industry and financial institutions. I have also lectured at Texas A&M University on a number of petroleum related subjects including market value determination for oil and gas properties, risk analysis, and financing of petroleum related projects. A true and correct copy of my resume is attached as Exhibit A.

4. I have previously testified on various oil and gas matters, including the valuation of oil and gas transactions in numerous proceedings in United States Federal Court, Oklahoma, and Texas State Courts, Canadian Federal Court, and before the United Nations Compensation Commission. The statements and opinions stated herein are all made with consideration for my expertise and experience. A true and correct copy of my past testimony is attached as Exhibit B.

5. I am a licensed Professional Engineer in the State of Texas (License No. 57166) and Huddleston & Co., Inc. is a Registered Engineering Firm in Texas (Registration No. F-1024).

6. The statements and opinions stated herein are all made with consideration for my expertise and experience and my review of various depositions, discovery, and declarations produced in the course of the captioned litigation. I have been requested to review certain materials related to the above-captioned litigation in order to provide an opinion as to whether the Plaintiffs have been properly compensated for their share of production from leases in which they own a royalty interest. For the purposes of this declaration my opinions are qualitative in nature pending further production form Talisman.

7. Materials produced in this proceeding indicate that Talisman Energy USA, Inc. (Talisman) owns working interests in certain wells and leases located within the highly prolific Eagle Ford Shale trend located in Texas. It is my understanding that the subject leases are located in Bee, DeWitt, Karnes, LaSalle, Live Oak, and McMullen Counties. On an overall basis Talisman has represented that it has made royalty payments on 488 wells to a total of 3957 royalty owners.

*Huddleston & Co., Inc.*

8.  Representations of Mr. Neumann in his Declaration dated February 26, 2018, indicate that Talisman acted as the operator of all wells and leases from the inception of development in 2012 through July 2013. Effective August 2013, Statoil became the operator of the "Eastern" area of operations and effective April 2016, Statoil assumed operations for all jointly owned wells. Although Talisman was not the operator of all of the leases, for all periods of time, it made direct royalty payments for wells operated by both Talisman and Statoil Texas Onshore Properties LLC (Statoil).

9.  Based on information provided by Talisman in this proceeding, it has been determined that production from wells with different royalty ownership have been comingled and the net sales "allocated" back to the individual wells for the calculation of royalty payments. Talisman is required to make payments to royalty owners based on the actual volumes of oil (and/or condensate) and gas produced and saved from each well and/or lease. Talisman has admitted that under the various royalty owner leases, the royalty amount owed should be calculated based on the volume of oil or gas production sold or available for sale. (Talisman response to Interrogatory No. 7 and Request for Production 6.) However, Talisman and paid royalty on the basis of estimated allocated and shrunk volumes. In addition, the allocation methodologies were neither accurate nor rigorous.

10. Between 2013 and 2016, Talisman utilized gross wellhead oil/condensate volumes as measured at the on lease separator and captured in its PVR database as starting point for the calculation of royalty payments to Plaintiffs. Talisman has admitted that from March 2014 through February 2016 that the wellhead oil/condensate volumes were adjusted by a "shrink" factor to derive an estimated volume which was the basis for royalty payments. Talisman has stated (Defendants Responses to Plaintiffs First Set of Interrogatories – Interrogatory No. 2) that:

    *For condensate, in the Statoil-operated area due to the lack of allocated sales volumes from Statoil, the Company recorded as sales volumes the actual measured wellhead separator volume of un-stabilized condensate for each well. Since sales volumes are less than raw wellhead un-stabilized condensate volumes the Company applied an estimate of the overall shrinkage. The overall area-shrinkage factors applied were 0% for production for the period August 2013 through February 2014, 20% for production for the period March 2014 through October 2014 and December 2014, and 30% for the period January 2015 through March 2016....*

    Notwithstanding the above answer, the deposition of Mr. Colin Guze indicates that that there may have been a period of time in which a 10% shrinkage factor may have been utilized. (pp 165, 217)

    Talisman has stated that the above practice was limited to the Statoil operated properties; however, there is some evidence that Talisman was also shrinking gross production volumes for wells operated by Talisman.

    There is no question that the above procedure is a violation of industry standards and practice.

11. While I have not attempted to perform a detailed analysis of all of the Statoil operated wells, I have performed sufficient sampling to confirm that there is a 20-30% reduction (depending on the time period) in oil volumes paid to royalty owners by Talisman in comparison to the oil (condensate) volumes reported to the TRCC consistent with the representations of Talisman with respect to its interrogatory response.

*Huddleston & Co., Inc.*

12.     The production from Talisman wells was commingled through the use of sixteen treatment facilities commonly referred to as Central Delivery Points (CDPs). (Neumann Declaration February, 26, 2018) These CDPs would treat or in this instance "stabilize" the production from as many as 106 wells. (The 99 CDP) The use of such centralized treatment facilities with commingled production has become commonplace within the Eagle Ford Shale Trend, but is extremely rare in those cases in which there is a variation in ownership and fluid type. As described by the witnesses in this case, production was separated and measured at the wellhead and/or lease then the fluid stream was "recombined" before being commingled with the production from other wells presumably of differing ownership at the CDP. This commingled stream would again be separated between condensate, gas and water. During the "stabilization" of condensate, additional "flash gas" would be extracted from the liquid hydrocarbon stream and was commingled with the separated natural gas. The net commingled condensate would then be sold while the commingled gas production would be sent via pipeline to gas plant to extract natural gas liquids (NGLs) from the gas stream and the residual gas and NGLs were then sold. (Neumann pp 62-69)

Representations of Talisman (and consistent with my experience) is that the aggregate volume of condensate sold at the tailgate of the CDP is less than the combined volume of condensate measured at the individual wells. However, if the volume of condensate sold is less than that metered at the individual wells the volume of raw (unprocessed) gas that is obtained at the tailgate of the CDP would be expected to be greater than the aggregate volume metered at the individual wells.

13.     Comingling of production in Texas is permitted by the Texas Railroad Commission (TRCC) under certain circumstances as codified in Statewide Rules 26, 27 and 55 (Exhibits C, D and E). Although the practice and obligations associated with allocating production and accounting for sales is well understood by the oil and gas industry, it is not a common practice. In addition it is my experience that in the vast majority of cases in which comingling of production is permitted the wells involved have common ownership (including working interest, royalty interest, and overriding royalty interest) and the produced oil and gas have common physical properties. It is noted that Statewide Rule 26 states:

> *(3) Reasonable allocation required. The applicant must demonstrate to the Commission or its designee that the proposed commingling of hydrocarbons will not harm the correlative rights of the working or royalty interest owners of any of the wells to be commingled. The method of allocation of production to individual interests must accurately attribute to each interest its fair share of aggregated production.* (emphasis added)

Although Talisman did file the required Form P-17 for at least some of the wells and leases, it appears that it failed to file the required "allocation methodology" in support of the permits. (Form P-17 Instructions is attached as Exhibit F.) Even if Talisman did file all of the required forms it would not absolve Talisman of its obligation to accurately account for and to pay royalty owners for their share of production saved and sold.

14.     In the captioned litigation, Talisman either voluntarily commingled the production from wells of differing ownership as operator or took its share of commingled production in kind as well as the obligation to accurately allocate the net sales of production in a manner consistent with industry standards and best practices in the industry. (Talisman Interrogatory Answers 2, 7)

15.     Talisman has admitted that it allocated commingled gas sales back to the individual wells based on the chemical composition of the gas but that its production accounting system would not allow

*Huddleston & Co., Inc.*

Talisman to allocate condensate or flash gas generated from condensate in the same manner. (Guze p 75) Instead Talisman volumetrically allocated the net sales of condensate and flash gas based on gross production volumes measured at the wellhead. (Neumann pp 24, 180) The application of a compositional allocation as opposed to volumetric would result in different shrinkage amounts for each well and a corresponding different sales volume and royalty payment. (Neumann pp 27-28) This would be true for both condensate and gas as a result of the commingling of flash gas with the natural gas stream at the CDP. (Neumann pp 91-92) Talisman has admitted that the use of a compositional allocation method as opposed to volumetric allocation would result in royalty owners being paid on their actual share of commingled sales based on the actual fluid composition of their well. (Neumann p 31).

16. Talisman apparently investigated the proper method of allocating the net sales from commingled condensate production during the period 2013-2014 and reached the internal conclusion that volumetric allocation did not properly account for condensate shrink and the production of Flash Gas and that they needed to institute a "flash factor hybrid" allocation method. (Neumann p 121-122) Although Talisman believed that the flash factor hybrid methodology was "best suited for this area" the methodology was never implemented. (Neumann p 148) Talisman continued to pay royalty owners based on volumetrically allocated and comingled condensate and flash gas until at least March 2016.

17. The allocation of commingled gross production volumes and corresponding volumes of net production allocated back to the individual wells commingled is first and foremost an engineering function. In the Eagle Ford Shale, the industry standard for the allocation of net sales from commingled production would be a compositional allocation not a volumetric allocation. (Neumann pp 161, 164, 172-173) Given the nature of the produced hydrocarbons in the Eagle Ford formation it is my opinion that no reasonably prudent operator would utilize a volumetric allocation method for the areas in which the Talisman owned wells were located.

The API Manual of Petroleum Measurement Standards; Chapter 20, Allocation Measurement is commonly relied upon within the industry and supports composition allocation in this instance. (Neumann 161-164) Statoil, Talisman's joint venture partner allocates commingled condensate production on a compositional basis. (Neumann p 113) The overwhelming majority of oil companies and every third party vendor Talisman contacted used or recommended a compositional allocation methodology in the Eagle Ford. (Neumann pp 164-165, 185-186)

18. Talisman has admitted in several examples cited above and in other production that its allocation methodology was flawed. (Guze pp 138-141) Talisman's documents and testimony confirm a wide range of concerns with respect to the accuracy and completeness of its historical well data, including measured production volumes of oil/condensate, gas and water, periodic test data of produced fluid properties, and operating pressures of wellhead and/or lease level production equipment. In some instances, the "bad" data may have been left in the data management system and in others it may have been manually adjusted. (Neumann p 16).

A 2013 review of Talisman's production accounting system (PAS) and production volume reporting (PVR) applications showed they were set up without all the necessary information and would need to be "rebuilt", its measurement schematics required for production accounting setup were incomplete, not fully understood or only recently available, and "required metering "may not exist". (Neumann pp 138-138 and Deposition Exhibit No. 9) Talisman concluded in 2013 that there was a risk that both volume allocations and royalty payments were incorrect. (Neumann pp 139-140) Since there is substantial concern with respect to all of the above information which is required to

perform an accurate allocation of oil/condensate and gas production volumes it appears that Talisman is unable to retroactively perform an accurate allocation of the production volumes in reliable manner.

For example, Talisman's lack of reliable field data forced it to allocate the "gravity bank adjustment" payments volumetrically back to the individual well level rather than compositionally. (Bugamelli pp 159-161) Ms. Bugamelli also stated: "...I know that at the end of the day we decided that we didn't have the data historically for the liquid analysis; so, because we do a volumetric allocation for the condensate volumes that were going to do the same thing for the gravity bank." (p 162, 10-15) The inability to properly allocate the (API) gravity bank resulted in additional errors in the payment of royalties.

19. It is my understanding that prior to 2012 that all condensate was separated on site and was sold from tanks on location. When the CDPs became fully operational most (if not all) of the wells were being comingled with condensate sales occurring at the tailgate of the respective CDPs during the 2012-2013 time period. It is also possible to perform the same level of separation at the well or lease level as that being performed at the CDPs. If an operator were to install a second stage of separation it is possible to achieve the same degree of separation that is occurring at the CDPs. In addition, it would be expected that vapor recovery units would be installed on the lease tanks to recover any gas that may evolve after the separation process. The use of such a configuration would eliminate the record keeping and analysis necessarily associated with a CDP.

20. Notwithstanding the representations made by Talisman with respect to oil/condensate allocations with respect to Statoil operated wells, it is less clear how allocations were performed for those wells operated by Talisman. A comparison of oil volumes reported to the TRCC indicates close agreement to the volumes for which payments were made to royalty owners. Since Talisman has stated that production for (almost) all wells was comingled and sent via pipeline to CDPs where additional separation occurred including the removal of "flash gas" it is a certainty that the allocated volumes were less than those volumes measured at the individual wells.

21. The Texas Railroad Commission requires oil and gas operators to report production and disposition of all volumes of oil (and condensate) and gas produced (Exhibit G: Instructions Form PR: Monthly Production Report). At the time that both Talisman and Statoil were operating jointly owned wells, Talisman and Statoil were each making royalty payments to individual royalty owners. In the case of the Statoil operated wells it is obvious that volumes of condensate for which Talisman was compensating the royalty owners was much less than the volumes being paid by Statoil based on a limited review of individual properties. In addition the volumes of oil (or condensate) reported to the TRCC by Statoil were much higher than those volumes reflected on royalty owner check stubs by Talisman.

22. Mr. Neumann, in his initial declaration dated February 26, 2018, suggests that this use of HYSIS modeling may be "potentially more precise"; however, in the absence of reliable historical data to match the results of the model with actual results the output of the model is speculative at best.

Notwithstanding the ability to utilize a numerical model, it appears that whatever modeling was done, it was not utilized to allocate production nor has the model been used to adjust payments to the royalty owners.

23. Mr. Lerman in his declaration dated March 30, 2018, suggests that COPAS guidelines provide clarity to allocation methodologies. However, COPAS (Council of Petroleum Accounts Societies,

Inc.) does not specify allocation methodologies and the citation included in his declaration specifically states:

> Whatever allocation is used, care should be taken to insure its accuracy since the results of that allocation dictate payment to working interest and royalty owners, regulatory reporting and payment of taxes.

It is clear from the testimony and correspondence between Talisman employees that the methodology utilized was in no way represented to be accurate, the employees did not have the tools or expertise to perform an accurate allocation, and they simply utilized the most expedient method.

24. While Talisman has provided its methodology for the allocation of condensate sales and payment of royalties, the royalty payments for gas are much less transparent. The components of the gas available for sale and processing include wellhead measured volumes, any gas that may have evolved out of the condensate during pipeline transportation, and flash gas obtained at the CDP. Not only will the quality and composition of gas obtained from each of the above process be different, but with all of the gas being co-mingled an accurate allocation is imperative. To make matter even more challenging, gas processing results in a quantity of NGLs plus residual gas. I have not yet been provided with sufficient information to make a determination of whether the allocation has been performed properly or even if sufficient information exists in order to properly perform a compositional allocation.

25. In my opinion, disclosures provided by Talisman and information obtained from public records clearly indicate that improper payments were being made to royalty owners by Talisman. The improper payments are the result of the arbitrary adjustments applied to condensate volumes for the Statoil operated wells and improper allocation methodologies for use with commingled production.

26. Huddleston & Co., Inc. is being compensated on the basis of our normal hourly charges plus actual expenses. My billing rate is $400 per hour for all services.

27. The conclusions contained herein represent my opinions based on my review of material available in the subject litigation. In addition, I am continuing to review materials, deposition testimony, and other information as they become available. I reserve the right to consider additional information as it becomes available and to come to additional and/or revised conclusions within my areas of expertise.

Peter D. Huddleston, P.E.
Huddleston & Co., Inc.
Texas Registered Engineering Firm F-1024
May 8, 2018



EXHIBIT A

# PETER D. HUDDLESTON, P.E.
1221 McKinney, Suite 3700
Houston, Texas 77010

Huddleston & Co., Inc.                                                                                   1972 - Present
Chairman

## EDUCATION

Graduated from Texas A&M University in May 1980 with a Bachelor of Science degree in Petroleum Engineering. Employed as research assistant for insitu coal gasification project and laboratory assistant for core and gas measurement labs while attending Texas A&M University.

## HUDDLESTON & CO., INC.

Worked summers 1972-1978 as engineering assistant and roustabout. Since 1980 have practiced primarily as a reservoir engineer, providing reservoir and economic evaluations for the petroleum industry and financial institutions. Successful transactions have resulted in acquisitions, financing arrangements, and public offerings totaling in excess of $1 Billion. Reserve reports are prepared on a continuing basis for public reporting, financing, budgeting, litigation support, and/or evaluation of investment performance. Appointed President of Huddleston & Co., Inc., in February 1989 and Chairman April 2017. Formerly President of Peter Paul Petroleum Company from January 1999 until April 2017. Acted as Chairman of Continental Operating Company from 1993 until April 2017.

Huddleston & Co., Inc., has provided petroleum engineering consulting services for over 500 oil and gas companies, gas transmission companies, banks, and other financial institutions. Foreign projects have included Canada, South and Central America, Africa, Australia, China, Kuwait, Indonesia, the North Sea, and the Russian Federation (formerly the Soviet Union).

As President of Peter Paul Petroleum Company was responsible for the oversight and management of various private joint venture and partnership interests in over 2,000 producing properties resulting in cumulative distributions of more than $1 Billion to the owners and limited partners. Continental Operating Company, a privately held oil and gas operating company, operated as many as 500 wells located in Colorado, Kansas, Louisiana, North Dakota, Oklahoma, Texas, West Virginia and Wyoming between 1993 and 2017.

## PAPERS AND PRESENTATIONS TO PROFESSIONAL ORGANIZATIONS

Lectured at Texas A&M University multiple times for industry seminars, to student organizations and to senior petroleum engineering students on a number of petroleum related subjects including market value determination for oil and gas properties, risk analysis, financing of petroleum related projects and leadership. Presented a seminar pertaining to reservoir evaluation techniques to the Oil and Gas Ministry of Guatemala. Presented papers pertaining to petroleum investment and financing vehicles and reserve classification definitions to the Society of Petroleum Engineers. Composed papers relating to the Natural Gas Policy Act of 1978 and Reserve Recognition Accounting.

## SOCIETIES AND ORGANIZATIONS

Registered Professional Engineer (Texas No. 57166)
Texas A&M University Petroleum Engineering Academy of Distinguished Graduates
Society of Petroleum Engineers
Pi Epsilon Tau (Honor Society)
Texas A&M University Petroleum Engineering Advisory Board
Texas A&M University Petroleum Ventures Program Advisory Board
Bush School of Government & Public Service Development Council
The Houston Museum of Natural Science Board of Trustees; Chairman 2011
Texas A&M University at Galveston Board of Visitors

EXHIBIT B

# Huddleston & Co., Inc.

### Petroleum and Geological Engineers

9805 Katy Freeway, Suite 500
Houston, Texas 77024
(713) 209-1100

**PETER D. HUDDLESTON, P.E.**
**DEPOSITIONS AND COURT TESTIMONY**
**1987 – 2018**

| Client or Law Firm, Case Name, and Court | Date of Deposition | Date of Court Testimony |
|---|---|---|
| 1. **PORTER & CLEMENTS**<br>***DeCell Petroleum, Inc.,*** *v. Chapman Energy*<br>Texas District Court; Houston, Texas | | 11/87 |
| 2. **BEIRNE, MAYNARD & PARSONS**<br>***Robert E. Smith, et al.,*** *v. Fleet Capital Corporation*<br>Texas District Court; Houston, Texas | 08/92 | |
| 3. **SHULLY, ROBERTS & SLATTERY**<br>***Walter Oil & Gas Corporation*** *v. Vastar, et al.*<br>Federal District Court; New Orleans, Louisiana | 11/94 | |
| 4. **BRACEWELL & PATTERSON**<br>*Leslie Bitner, et al., v.* ***The Offshore Group, Inc.***<br>Texas District Court; Houston, Texas | 03/95 | |
| 5. **SECURITIES AND EXCHANGE COMMISSION**<br>***Securities and Exchange Commission*** *v. KS Resources, et al.*<br>Federal District Court; Los Angeles, California | 03/96 | |
| 6. **AKIN, GUMP, STRAUSS, HAUER & FELD**<br>*Steven W. Weller v.* ***Xavier Mines, Ltd.***<br>Texas District Court; Houston, Texas | 05/96 | |
| 7. **KLEBERG & HEAD**<br>*Gohlke Farms, Inc., v.* ***Roywell Services, Inc.***<br>Texas District Court; Goliad, Texas | | 04/97 |
| 8. **MACDONALD MCMAHON KINGSTONE & HANLEY**<br>***Canada Southern Petroleum Ltd.*** *v. Columbia Gas Development of Canada, et al.*<br>Alberta, Canada | | 05/98 |
| 9. **POPP & IKARD, LLP**<br>***Coastal Oil and Gas Corporation*** *v. Starr County Appraisal Review Board*<br>Texas District Court; Starr County, Texas | 09/98 | |

| Client or Law Firm, Case Name, and Court | Date of Deposition | Date of Court Testimony |
|---|---|---|
| 10. **AKIN, GUMP, STRAUSS, HAUER & FELD** <br> *Eulalia Vela, et al., v. Energy Development Corporation, et al.* <br> Texas District Court; Zapata County, Texas | 11/98 | |
| 11. **UNITED NATIONS COMPENSATION COMMISSION** <br> *Kuwait Oil Loss Compensation Claims* <br> Geneva, Switzerland | | 06/99 <br> 10/99 <br> 09/00 |
| 12. **SIMON, PERAGINE, SMITH & REDFEARN** <br> *WRT Creditors Liquidation Trust v. Benton Oil & Gas Company, et al.* <br> Federal Bankruptcy Court; Opelousas, Louisiana | 06/99 <br> 08/99 <br> 09/99 | 07/00 |
| 13. **POPP & IKARD, LLP** <br> *Coastal Oil and Gas Corporation v. Zapata County Appraisal District* <br> Texas District Court; Zapata County, Texas | 08/99 | |
| 14. **SHEINFELD, MALEY & KAY** <br> *Tri-Union Development Corporation v. Credit Lyonaise, et al.* <br> Federal Bankruptcy Court; Houston, Texas | | 04/00 <br> 05/00 <br> 02/01 |
| 15. **U.S. DEPARTMENT OF JUSTICE** <br> *United States of America v. Mark Seigel, et al.* <br> Federal District Court; Los Angeles, California | | 09/00 |
| 16. **JACKSON & WALKER** <br> *Edge Petroleum Exploration, et al., v. BNP Petroleum, et al.* <br> Texas District Court; San Diego, Texas | | 12/00 |
| 17. **CLEMENTS, O'NEILL, PIERCE, NICKENS & WILSON, LLP** <br> *Yucca Supply Company v. Continental Operating Company* <br> 157th Judicial District Court; Harris County, Texas | | 08/01 |
| 18. **MEHAFFEY & WEBBER** <br> *Janice Copeland, et al., v. Antonio Villalon, Trustee, and Robert Eugene Wiggins* <br> Texas District Court; Jefferson County, Texas | 10/01 | |
| 19. **CHRIS HARPER, INC.** <br> *Bogo Energy Corporation v. Belco Energy Corp. (Case No. CJ-2000-159)* <br> Oklahoma District Court; Kingfisher County, Oklahoma | 01/02 | |
| 20. **M. STEVE SMITH & ASSOCIATES** <br> *Austin Resources Corporation v. Douglas Bailey, et al. (Case No. 2001-34684)* <br> 129th Judicial District Court; Harris County, Texas | 08/02 | |

| Client or Law Firm, Case Name, and Court | Date of Deposition | Date of Court Testimony |
|---|---|---|
| 21. **SECURITIES AND EXCHANGE COMMISSION**<br>*SEC v. Environmental Energy, Inc., et al.;* Case No. CV 98-6060 MMM (BQRx)<br>Federal District Court; Los Angeles, California | 01/03 | 01/03 |
| 22: **WATT, BECKWORTH & THOMPSON, L.L.P. & LOCKE, LIDDELL & SAPP, L.L.P.**<br>*David C. Holland, et al., v. Exxon Company, U.S.A., et al.;* Cause No. B-160548<br>District Court of Jefferson County, Texas, 60th Judicial District | 02/03<br>02/07 | |
| 23. **WATT BECKWORTH THOMPSON & HENNEMAN, L.L.P.**<br>*Moose Oil & Gas Company, Debtor – and – Doris Barnes v. Dominion Oklahoma Texas Exploration & Production, Inc., Moose Oil & Gas Company;*<br>Case No. 02-33891-H5; Adversary No. 02-6012<br>United States Bankruptcy Court for the Southern District of Texas, Houston Division | 04/04 | |
| 24. **GIBBS & BRUNS L.L.P.**<br>*COREnergy, L.L.C., et al., v. Devon Energy Production Company, L.P., et al.;*<br>Cause No. 2003-58484<br>District Court of Harris County, Texas, 190th Judicial District | 01/05 | |
| 25. **MEHAFFYWEBER, PC**<br>*Robert E. Wiggins, et al., v. Cimarex Energy Co. and Magnum Producing*<br>Cause No. D-172,769<br>District Court of Jefferson County, Texas 136th Judicial District | 01/07 | |
| 26. **ZABEL FREEMAN, L.L.P.**<br>*Cliff Hoskins, Inc. v. BP America Production Company v. Prize Energy Resoures L.P., et al.*<br>Cause No. MO5-0002-CV-C<br>District Court of McMullen County, Texas 343rd Judicial District | 07/07 | 03/09 |
| 27. **THE FREEMAN LAW FIRM, P.C.**<br>*Expre Oil & Gas, L.L.P. v. Houston Petroleum Company*<br>Cause No. 40212<br>District Court of Brazoria County, Texas 239th Judicial District | 11/08<br>06/09 | |
| 28. **LOCKE LORD LLP**<br>*Andrew T. Berger v. Icahn Enterprises L.P., Robert G. Alexander, Jon F. Weber, Robert J. Mitchell, Jack G. Wasserman, Robert H. Kite and National Energy Group, Inc.*<br>C.A. No. 3522-VCS<br>Court of Chancery of the State of Delaware | 10/09 | |

| Client or Law Firm, Case Name, and Court | Date of Deposition | Date of Court Testimony |
|---|---|---|
| 29. **SMYSER KAPLAN & VESELKA, L.L.P.**<br>*Beach Capital Pamership, L.P., Playa Oil & Gas GP, LLC, et al. v. Deeprock Venture Parners, LP and Paul Touradji*<br>Cause No. 2008-57962<br>District Court of Harris County, Texas, 55th Judicial District | 09/10 | |
| 30. **ORGAIN, BELL & TUCKER, L.L.P.**<br>*Harrison Interests, Ltd. v. Aspect Energy, LLC*<br>Cause No. E181764<br>District Court of Jefferson County, Texas, 172nd Judicial District | 11/10 | 05/11 |
| 31. **THE MCCALL FIRM**<br>*David Wilstein and Leonard Wilstein, v. Dernick Resources, Inc.*<br>Cause No. 2002-31310<br>District Court of Harris County, Texas, 164th Judicial District | 11/11 | |
| 32. **RINEY & MAYFIELD LLP**<br>*Amarillo National Bank, et al. v. Donna Kim Flowers, et al.*<br>Cause No. 66,494-B<br>District Court of Hemphill County, Texas 31st Judicial District | 2/14 | |
| 33. **SUSMAN GODFREY L.L.P.**<br>*Jeffrey Schulein, et al. v. Petroleum Development Corporation, et al.*<br>Cause No. SACV 11-1891 AG (Anx)<br>United States District Court, Central District of California, Southern Division | 3/14 | |
| 34. **RUSTY HARDIN & ASSOCIATES, PC**<br>*Smith Energy Company v. Mark P. Hardwick, et al.*<br>Cause No. 2011-68059<br>District Court of Harris County, Texas, 55th Judicial District | 5/14 | 8/14 |
| 35. **LITCHFIELD CAVO, LLP**<br>*North Plains Energy, LLC v. TAM International, Inc.*<br>Cause No. 2012-47659<br>District Court of Harris County, Texas 234th Judicial District | 7/14 | |
| 36. **PIERCE & O'NEILL**<br>*Le Norman Operating LLC v. Chalker Energy Partners III, LLC, et al.*<br>Cause No. 2013-24978<br>District Court of Harris County, Texas 234th Judicial District | 10/14 | |

| Client or Law Firm, Case Name, and Court | Date of Deposition | Date of Court Testimony |
|---|---|---|
| 37. SMYSER, KAPLAN & VESELKA, L.L.P<br>*Enduring Resources II, LLC v. American Energy – Permian Basin, LLC*<br>Cause No. 2015-11761<br>District Court of Harris County, Texas 80th Judicial District | 3/16 | |
| 38. LITCHFIELD CAVO, LLP<br>*Hibernia Resources, LLC v. KC Pipe and Northwest Pipe Company*<br>Cause No. 6669<br>District Court of Martin County, Texas 234th Judicial District | 6/16 | |
| 39. UHL, FITZSIMONS, JEWETT & BURTON, PLLC<br>*Joseph B.C. Fitzsimons et al. v. BlackBrush Oil & Gas L.P.*<br>Cause No. 14-03-29536-MCV<br>District Court of Maverick County, Texas 293rd Judicial District | 7/16 | |
| 40. LITCHFIELD CAVO, LLP<br>*Blackbrush Oil & Gas v. GB Tubulars, Inc, et al.*<br>Cause No. 13-09-00195-CVK<br>District Court of Karnes County, Texas 81st Judicial District | 3/17 | |
| 41. Stacy Baker, P.C.<br>*Jeff Compton, Liquidating Trustee v. Curtis Burton, et al.*<br>Cause No. 2015-66898<br>District Court of Harris County, Texas 190th Judicial District | 6/17 | 3/18 |
| 42. Langley & Banak Incorporated<br>*Stacie Renee Esse Woelfel, et al. v. Pioneer Natural Resources USA, Inc.*<br>Cause No. L-15-0131-CV-C<br>District Court of Live Oak County, Texas 343rd Judicial District | 8/17 | |
| 43. Law Offices of Patrick Zummo<br>*Apollo Exploration, LLC, et al. v. Apache Corporation*<br>Cause No. CV50538<br>District Court of Midland County, Texas 385th Judicial District | 1/18 | |
| 44. Foley Bezek Behle & Curtis, LLP<br>*Christopher J. Rodenfels, Trustee v. PDC Energy, Inc.*<br>Cause No. 1:16-CV-00251-PAB(STV)<br>United States District Court, District of Colorado | 3/18 | |

EXHIBIT C

<<Prev Rule                                                           Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 16 | ECONOMIC REGULATION |
| PART 1 | RAILROAD COMMISSION OF TEXAS |
| CHAPTER 3 | OIL AND GAS DIVISION |
| RULE §3.26 | Separating Devices, Tanks, and Surface Commingling of Oil |

(a) Where oil and gas are found in the same stratum and it is impossible to separate one from the other, or when a well has been classified as a gas well and such gas well is not connected to a cycling plant and such well is being produced on a lease and the gas is utilized under Texas Natural Resources Code §§86.181 - 86.185, the operator shall install a separating device of approved type and sufficient capacity to separate the oil and liquid hydrocarbons from the gas.

(1) The separating device shall be kept in place as long as a necessity for it exists, and, after being installed, such device shall not be removed nor the use thereof discontinued without the consent of the commission.

(2) All oil and any other liquid hydrocarbons as and when produced shall be adequately measured according to the pipeline rules and regulations of the commission before the same leaves the lease from which they are produced, except for gas wells where the full well stream is moved to a plant or central separation facility in accordance with §3.55 of this title (relating to Reports on Gas Wells Commingling Liquid Hydrocarbons before Metering) (Statewide Rule 55) and the full well stream is measured, with each completion being separately measured, before the gas leaves the lease.

(3) Sufficient tankage and separator capacity shall be provided by the producer to adequately take daily gauges of all oil and any other liquid hydrocarbons unless LACT equipment, installed and operated in accordance with the latest revision of American Petroleum Institute (API) Manual of Petroleum Measurement Standards, Chapter 6.1 or another method approved by the commission or its delegate, is being used to effect custody transfer.

(4) For commission purposes, the measurement requirements of this section are satisfied by the use of coriolis or turbine meters or any other measurement device or technology that conforms to standards established, as of the time of installation, by the American Petroleum Institute (API) or the American Gas Association (AGA) for measuring oil or gas, as applicable, or approved by the Director of the Oil and Gas Division as an accurate measurement technology.

(b) In order to prevent waste, to promote conservation or to protect correlative rights, the commission may approve surface commingling of oil, gas, or oil and gas production from two or more tracts of land producing from the same commission-designated reservoir or from one or more tracts of land producing from different commission-designated reservoirs as follows:

(1) Administrative approval. Upon written application, the commission may grant approval for surface commingling administratively when any one of the following conditions is met:

(A) The tracts or commission-designated reservoirs have identical working interest and royalty interest ownership in identical percentages and therefore there is no commingling of separate interests;

(B) Production from each tract and each commission-designated reservoir is separately measured and therefore there is no commingling of separate interests; or

(C) When the tracts or commission-designated reservoirs do not have identical working interest and royalty interest ownership in identical percentages and the commission has not received a protest to an application within 21 days of notice of the application being mailed by the applicant to all working and royalty interest owners or, if publication is required, within 21 days of the date of last publication and the applicant provides:

(i) a method of allocating production to ensure the protection of correlative rights, in accordance with paragraph (3) of this subsection; and

(ii) an affidavit or other evidence that all working interest and royalty interest owners have been notified of the application by certified mail or have provided applicant with waivers of notice requirements; or

(iii) in the event the applicant is unable, after due diligence, to provide notice by certified mail to all working interest and royalty interest owners, a publisher's affidavit or other evidence that the commission's notice of application has been published once a week for four consecutive weeks in a newspaper of general circulation in the county or counties in which the tracts that are the subject of the application are located.

(2) Request for hearing. When the tracts or commission-designated reservoirs do not have identical working interest and royalty interest ownership in identical percentages and a person entitled to notice of the application has filed a protest to the application with the commission, the applicant may request a hearing on the application. The commission shall give notice of the hearing to all working interest and royalty interest owners. The commission may permit the commingling if the applicant demonstrates

that the proposed commingling will protect the rights of all interest owners in accordance with paragraph (3) of this subsection and will prevent waste, promote conservation or protect correlative rights.

(3) Reasonable allocation required. The applicant must demonstrate to the Commission or its designee that the proposed commingling of hydrocarbons will not harm the correlative rights of the working or royalty interest owners of any of the wells to be commingled. The method of allocation of production to individual interests must accurately attribute to each interest its fair share of aggregated production.

(A) In the absence of contrary information, such as indications of material fluctuations in the monthly production volume of a well proposed for commingling, the Commission will presume that allocation based on the daily production rate for each well as determined and reported to the Commission by semi-annual well tests will accurately attribute to each interest its fair share of production without harm to correlative rights. As used in this section, "daily production rate" for a well means the 24 hour production rate determined by the most recent well test conducted and reported to the commission in accordance with §§3.28, 3.52, 3.53, and 3.55 of this title (relating to Potential and Deliverability of Gas Wells To Be Ascertained and Reported, Oil Well Allowable Production, Annual Well Tests and Well Status Reports Required, and Reports on Gas Wells Commingling Liquid Hydrocarbons before Metering).

(B) Operators may test commingled wells annually after approval by the Commission or the commission's delegate of the operator's written request demonstrating that annual testing will not harm the correlative rights of the working or royalty interest owners of the commingled wells. Allocation of commingled production shall not be based on well tests conducted less frequently than annually.

(C) Nothing in this section prohibits allocations based on more frequent well tests than the semi-annual well test set out in subparagraph (A) of this paragraph. Additional tests used for allocation do not have to be filed with the commission but must be available for inspection at the request of the commission, working interest owners or royalty interest owners.

(D) Allocations may be based on a method other than periodic well tests if the Commission or its designee determines that the alternative allocation method will insure a reasonable allocation of production as required by this paragraph.

(4) Additional notice required. In addition to giving notice to the persons entitled to notice under paragraph (1)(C) of this subsection, an applicant for a surface commingling exception must give notice of the application to the operator of each tract adjacent to one or more of the tracts proposed for commingling that has one or

more wells producing from the same commission-designated reservoir as any well proposed for commingling if:

(A) any one of the wells proposed for commingling produces from a commission-designated reservoir for which special field rules have been adopted; or

(B) any one of the wells proposed for commingling produces from multiple commission-designated reservoirs, unless:

(i) an exception to §3.10 of this title (relating to Restriction of Production of Oil and Gas from Different Strata) has previously been obtained for production from the well; or

(ii) the applicant continues to separately measure production from each different commission-designated reservoir produced from the same wellbore.

(c) If oil or any other liquid hydrocarbon is produced from a lease or other property covered by the coastal or inland waters of the state, the liquid produced may, at the option of the operator, be measured on a shore or at a point removed from the lease or other property on which it is produced.

(d) Oil gravity tests and reports (Reference Order Number 20-55, 647, effective 4-1-66, and Reference Order Number 20-58, 528, effective 5-10-68.)

(1) Where individual lease oil production, or authorized commingled oil production, separator, treating, and/or storage vessels, other than conventional emulsion breaking treaters, are connected to a gas gathering system so that heat or vacuum may be applied prior to oil measurement for commission-required production reports, the operator may, at his option, apply heat or vacuum to the oil only to the extent the average gravity of the stock tank oil will not be reduced below a limiting gravity for each lease as established by an average oil gravity test conducted under the following conditions (Reference Order Number 20-55, 647, effective 4-1-66):

(A) the separator or separator system, which shall include any type vessel that is used to separate hydrocarbons, shall be operated at not less than atmospheric pressure;

(B) no heat shall be applied;

(C) the test interval shall be for a minimum of 24 hours, and the average oil gravity after weathering for not more than 24 hours shall then become the limiting gravity factor for applying heat or vacuum to unmeasured oil on the tested lease.

(2) Initial gravity tests shall be made by the operator when such separator, treating, and/or storage vessels are first used pursuant to this section. Subsequent tests shall be made at the request of either the commission or any interested party; and such subsequent tests shall be witnessed by the requesting party. Any interested party may witness the tests.

(3) Each operator shall enter on the face of his required production report the gravity of the oil delivered to market from the lease reported, and it is provided that should a volume of oil delivered to market from such lease separation facilities not meet the gravity requirement established by the described test, adjustment shall be made by charging the allowable of the lease on the relationship of the volume and the gravity of the particular crude.

(4) Where a conventional heater treater is required and is used only to break oil from an emulsion prior to oil measurement, this section will not be applicable; provided, however, that by this limitation on the section, it is not intended that excessive heat may be used in conventional heater treater, and in circumstances where such heater treater is connected to a gas gathering system and it is found by commission investigation made on its own volition or on complaint of any interested party that excessive heat is used, either the provisions of this section or special restrictive regulation may be made applicable.

**Source Note:** The provisions of this §3.26 adopted January 1, 1976; amended to be effective February 23, 1979, 4 TexReg 436; amended to be effective March 10, 1986, 11 TexReg 901; amended to be effective February 18, 1994, 19 TexReg 783; amended to be effective June 23, 1997, 22 TexReg 5747; amended to be effective May 1, 2000, 25 TexReg 3741; amended to be effective November 24, 2004, 29 TexReg 10728; amended to be effective April 28, 2015, 40 TexReg 2275

List of Titles | Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS



EXHIBIT D

<<Prev Rule                                                      Next Rule>>

# Texas Administrative Code

| TITLE 16 | ECONOMIC REGULATION |
| PART 1 | RAILROAD COMMISSION OF TEXAS |
| CHAPTER 3 | OIL AND GAS DIVISION |
| RULE §3.27 | Gas To Be Measured and Surface Commingling of Gas |

(a) All natural gas, except casinghead gas, produced from wells shall be measured, with each completion being measured separately, before the gas leaves the lease, and the producer shall report the volume produced from each completion to the commission. For commission purposes, the measurement requirements of this section are satisfied by the use of coriolis or turbine meters or any other measurement device or technology that conforms to standards established, as of the time of installation, by the American Petroleum Institute (API) or the American Gas Association (AGA) for measuring oil or gas, as applicable, or approved by the Director of the Oil and Gas Division as an accurate measurement technology. Exceptions to this provision may be granted by the commission upon written application.

(b) All casinghead gas sold, processed for its gasoline content, used in a field other than that in which it is produced, or used in cycling or repressuring operations, shall be measured before the gas leaves the lease, and the producer shall report the volume produced to the commission. Exceptions to this provision may be granted by the commission upon written application.

(c) All casinghead gas produced in this state which is not covered by the provisions of subsection (b) of this section, shall be measured before the gas leaves the lease, is used as fuel, or is released into the air, based on its use or on periodic tests, and reported to the commission by the producer. The volume of casinghead gas produced by wells exempt from gas/oil ratio surveys must be estimated, based on general knowledge of the characteristics of the wells. Exceptions to this provision may be granted by the commission upon written application.

(d) Releases and production of gas at a volume or daily flow rate, commonly referred to as "too small to measure" (TSTM), which, due to minute quantity, cannot be accurately determined or for which a determination of gas volume is not reasonably practical using routine oil and gas industry methods, practices, and techniques are exempt from compliance with this rule and are not required to be reported to the commission or charged against lease allowable production.

(e) In order to prevent waste, to promote conservation or to protect correlative rights, the commission may approve surface commingling of gas or oil and gas described in subsections (a), (b) or (c) of this section and produced from two or more tracts of land producing from the same commission-designated reservoir or from one or more tracts of land producing from different commission-designated reservoirs in accordance with §3.26(b) of this title (relating to Separating Devices, Tanks, and Surface Commingling of Oil).

(f) In reporting gas well production, the full-well stream gas shall be reported and charged against each gas well for allowable purposes. All gas produced, including all gas used on the lease or released into the air, must be reported regardless of its disposition.

(g) If gas is produced from a lease or other property covered by the coastal or inland waters of the state, the gas produced may, at the option of the operator, be measured on a shore or at a point removed from the lease or other property from which it was produced.

(h) All natural hydrocarbon gas produced and utilized from wells completed in geothermal resource reservoirs shall be measured and allocated to each individual lease based on semiannual tests conducted on full well stream lease production.

(i) For purposes of this rule, "measured" shall mean a determination of gas volume in accordance with this rule and other rules of the commission, including accurate estimates of unmetered gas volumes released into the air or used as fuel.

(j) No meter or meter run used for measuring gas as required by this rule shall be equipped with a manifold which will allow gas flow to be diverted or bypassed around the metering element in any manner unless it is of the type listed in paragraphs (1) or (2) of this subsection:

 (1) double chambered orifice meter fittings with proper meter manifolding to allow equalized pressure across the meter during servicing;

 (2) double chambered or single chambered orifice meter fittings equipped with proper meter manifolding or other types of metering devices accompanied by one of the following types of meter inspection manifolds:

  (A) a manifold with block valves on each end of the meter run and a single block valve in the manifold complete with provisions to seal and a continuously maintained seal record;

(B) an inspection manifold having block valves at each end of the meter run and two block valves in the manifold with a bleeder between the two and with one valve equipped with provisions to seal and continuously maintained seal records;

(C) a manifold equipped with block valves at each end of the meter run and one or more block valves in the manifold, when accompanied by a documented waiver from the owner or owners of at least 60% of the royalty interest and the owner or owners of at least 60% of the working interest of the lease from which the gas is produced.

(k) Whenever sealing procedures are used to provide security in the meter inspection manifold systems, the seal records shall be maintained for at least three years at an appropriate office and made available for Railroad Commission inspection during normal working hours. At any time a seal is broken or replaced, a notation will be made on the orifice meter chart along with graphic representation of estimated gas flow during the time the meter is out of service.

(l) All meter requirements apply to all meters which are used to measure lease production, including sales meters if sales meter volumes are allocated back to individual leases.

(m) The commission may grant an exception to measurement requirements under subsections (a), (b) and (c) of this section if the requirements of this subsection are met. An exception granted under this subsection will be revoked if the most recent well test or production reported to the commission reflects a production rate of more than 20 MCF of gas per day or if any of the other requirements for an exception under this subsection are no longer satisfied. An applicant seeking an exception under this subsection must file an application establishing:

(1) the most recent production test reported to the commission demonstrates that the gas well or oil lease for which an exception is sought produces at a rate of no more than 20 MCF of gas per day;

(2) an annual test of the production of the gas well or oil lease provides an accurate estimate of the daily rate of gas flow;

(3) the flow rate established in paragraph (2) of this subsection multiplied by the recorded duration determined by any device or means that accurately records the duration of production each month yields an accurate estimate of monthly production; and

(4) the operator of the pipeline connected to the gas well or oil lease concurs in writing with the application.

(n) Failure to comply with the provisions of this rule will result in severance of the producing well, lease, facility, or gas pipeline or in other appropriate enforcement proceeding.

**Source Note:** The provisions of this §3.27 adopted to be effective January 1, 1976; amended to be effective April 12, 1983, 8 TexReg 1019; amended to be effective March 10, 1986, 11 TexReg 901; amended to be effective June 23, 1997, 22 TexReg 5747; amended to be effective April 28, 2015, 40 TexReg 2275

| List of Titles | Back to List |

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

EXHIBIT E

# Texas Administrative Code

| | |
|---|---|
| TITLE 16 | ECONOMIC REGULATION |
| PART 1 | RAILROAD COMMISSION OF TEXAS |
| CHAPTER 3 | OIL AND GAS DIVISION |
| RULE §3.55 | Reports on Gas Wells Commingling Liquid Hydrocarbons before Metering |

(a) When the full well stream from a gas well is moved to a plant or central separation facilities, and the liquid hydrocarbons produced by two or more wells are commingled without being measured or metered from each gas well, the operator of each well so producing shall periodically file with the commission, as provided for in this section, a report showing the following information for each well:

(1) the specific gravity of the gas at 60 degrees Fahrenheit, after the removal of the liquid hydrocarbons;

(2) the API gravity corrected to 60 degrees Fahrenheit of the liquid hydrocarbons removed;

(3) the number of stock tank barrels of liquid hydrocarbons (corrected to 60 degrees Fahrenheit) recovered per 1,000 standard cubic feet of gas.

(b) Tests.

(1) The tests necessary for this report shall be made by one or more of the following methods:

(A) conventional mechanical separation;

(B) low temperature separation;

(C) split stream method;

(D) in accordance with AGA-NGAA Testing Code 101-43.

(2) The tests shall be made semiannually, or quarterly if contracts for royalty payments require quarterly tests. Semiannual tests must be made during the first and third or second and fourth quarters of the year. If a contract for royalty payments requires quarterly tests, the tests shall be made during each quarter. Both semiannual and quarterly tests may be made during any month of the quarter if the same (first, second, or third) month of each quarter is used thereafter for any well.

(c) The results of each test shall be submitted in duplicate on the appropriate commission form to the proper commission district office not later than the 15th day of each month following the month in which the test is made. The tests shall be required when the conditions set out in the first paragraph of this section exist, regardless of whether or not the conditions are an exception to §3.26 of this title (relating to Separating Devices,

Tanks, and Surface Commingling of Oil) (Statewide Rule 26). The tests shall not be required, however, in any reservoir in which 100% of the operating and royalty ownership has been unitized.

(d) This section does not purport to alter any procedure for periodic tests of gas wells that has previously been approved by the commission. If test periods agreed upon by the interested parties have not been approved by the commission, and if the periods agreed upon differ from the test periods provided for in this section, alternative testing periods may be approved by the commission upon application.

**Source Note:** The provisions of this §3.55 adopted to be effective January 1, 1976; amended to be effective March 10, 1986, 11 TexReg 901; amended to be effective November 24, 2004, 29 TexReg 10728

List of Titles          Back to List

EXHIBIT F

### REVIEW AND BECOME FAMILIAR WITH SWR 26 AND SWR 27 BEFORE FILING FORM P-17.
### FOR ADDITIONAL INSTRUCTIONS PLEASE CONSULT
### THE PERMITTING & PRODUCTION SERVICES FILING PROCEDURES MANUAL.

## GENERAL

**WHEN TO FILE.** Oil/condensate and natural gas production must be measured prior to leaving the lease and/or custody transfer. Liquid production from each lease/gas well must be placed in a separate stock tank if stored on the lease prior to custody transfer. An exception to individual lease/gas well metering and storage may be requested by filing Form P-17 with supporting documentation as required.

**WHO FILES.** An operator of oil and gas production under authority of the Commission P-5 who is responsible for compliance with statewide Rules 26, 27, and/or 55 files Form P-17 in accordance with these instructions.

**COMPLIANCE.** In order to file a Form P-17, the applicant must have on file with the Railroad Commission (RRC) a current P-5 Organization Report and financial assurance (if required) and must be in compliance with all RRC rules and orders. The applicant must be the operator of the commingled facility as shown in SECTION 1 on Form P-17.

**WHERE AND WHAT TO FILE.** File the original and two copies of Form P-17 and any required attachments and fees with the Railroad Commission by hand delivery or mail to the following address: Railroad Commission of Texas, P. O. Box 12967, Austin, Texas 78711-2967.

**FEES.** A **filing fee of $150 is required** with each Form P-17, unless the only purpose for filing Form P-17 is to delete a lease(s) or well(s) from an existing commingling permit. An additional $150 filing fee is required for each request of an exception to meter oil or condensate with a **Turbine meter or Coriolis meter.** Fees are non-refundable. Make checks or money orders payable to "Railroad Commission of Texas." The Commission also accepts payment by credit card. For information about payment by credit card, see http://www.rrc.state.tx.us/programs/datasets/crcard.php

**PURPOSE OF FILING.** File Form P-17 as provided for in Statewide Rules 26, 27 and 55 for the following:
    (1) surface commingling of liquid hydrocarbon (oil, condensate or a combination of oil and condensate) production into a common facility OR surface commingling of liquid hydrocarbons and gas production into a common facility with liquids reported on Form PR (these are the only commingling situations in which a permit number will be assigned for reporting on Form-PR, Production Report);
    (2) production of gas wells full well stream to a plant/common facility with liquids reported on Form R-3;
    (3) gas metering exceptions;
    (4) off-lease separation/storage/metering.
    (5) amending an existing surface commingling permit (complete SECTIONS 1 through 6 of Form P-17).

File Form P-17 to amend an existing surface commingling approval if a lease consolidation, unitization, field transfer, or work-over/re-completion of a surface commingled lease/gas well occurs. In addition, stock on hand must be transferred on the Form PR.

## IMPORTANT TERMS
<u>Common separation and storage</u>: production from two or more leases or wells is combined into one separating device/facility with the liquids placed in common storage.

<u>Common storage only</u>: when each commingled lease or well has a separating device and the liquids are stored in a common tank after individual separation.

<u>Deduct Metering</u>: a method of allocating production to a non-metered gas well by subtracting other individually measured well volumes from the total measured gas volume.

<u>District and County</u> (top, right-hand corner): the Railroad Commission District and County where the commingling facility is physically located.

<u>Effective Month/Year of Requested Exception</u> (top, left-hand corner): the initial month of surface commingling (or amendment/change effective month) and the reporting of commingled production on a combined report. The "effective Month/Year" is the month that commingling actually begins.

**Effective month of deletion:** When a lease/well becomes inactive and must be deleted from a permit, all stock on hand must be disposed of before filing an amended Form P-17 to delete the lease/well. The effective month of deletion should be the month following the month of the last disposition of production. When discontinuing the operating and reporting of facilities, the Commission and the gatherer must be notified of the effective month of permit cancellation.

**Location plat:** a plat that shows the location of all leases involved in the application. A location plat is required with a Form P-17 for (1) off lease storage of oil or condensate or (2) off lease metering of gas or liquids. The location plat should show the approximate location of L.A.C.T. units, meters, tank batteries, and any other separation, metering, or storage facilities involved in the surface commingling application.

**Off-Lease:** A location or lease not listed in this application.

**RRC Identifier:** all existing or new oil lease numbers, gas identification numbers, or drilling permit numbers as applicable on Form P-17.

## INSTRUCTIONS FOR SECTION 3. REQUEST TO COMMINGLE

**BOX 3.a.** When **producing a gas well full well stream into a common facility with condensate reported on Form PR**, the Form P-4 should show both a gas gatherer and a condensate gatherer. A commingling permit number will be assigned and must be reported on Form PR for the individual wells.

**BOX 3.b.** When **producing a gas well full well stream to a gasoline plant or common facility where condensate is reported on Form R-3**, the Form PR for the well should show only the full well stream gas production volume and no condensate. The Form P-4 should designate a "full well stream" gatherer but no condensate gatherers. The commingling occurs at the facility reported on Form R-3, Monthly Report for Gas Processing Plants. A permit number is not issued for this type of commingling and is not reported on the Form-PR.

**BOX 3.d.** When requesting **off lease separation and/or storage of liquids or off lease metering**, show only the lease requesting off lease authority on the Form P-17 and attach a location plat showing the location of the facilities. Do not list the lease on which the facilities are to be located.

## INSTRUCTIONS FOR SECTION 4. NOTICE REQUIREMENTS AND ALLOCATION METHOD

Notice of application (NOA) is NOT required if you check any one of BOXES 4.a, 4.b, 4.e or 4.f.

**Notice of Application (NOA) IS required if you check BOX 4.c.** If the royalty and working interest owners of all leases producing into the common separation and/or storage facility are not the same and you do not meter before commingling, you must provide a 21-day notice of this application to, or waivers of objection from, the royalty and working interest owners in accordance with SWR 26(b)(1)(C).

**In addition, if you DO NOT check BOX 4.a.**, you must indicate the method of allocation of production in accordance with SWR 26(b)(3). ATTACH to this FORM P-17 a diagram/schematic that shows all meters, separators, and other production equipment where production from each well is separated, metered, and/or commingled.

ADDITIONAL notice of application (NOA) IS required if you check BOX 4.d. and/or 4.g., but do NOT check BOXES 4.e, & 4.f. If the wells proposed for commingling produce from multiple reservoirs or any one of the wells proposed for commingling produces from a Commission-designated reservoir for which special field rules have been adopted, you must provide additional notice of the application **to all offset operators** of adjacent tracts having one or more wells producing from the same reservoirs (SWR 26(b)(4). ATTACH to this Form P-17 an Affidavit stating that notice of the application was sent by certified mail or that waivers of objection were received.

## INSTRUCTIONS FOR SECTION 5  NAME OF WELL OPERATOR
Check the BOX in SECTION 5 if the operator of any well proposed for commingling is different from the operator listed in SECTION 1 of the Form P-17. If you check this box, ATTACH a listing of the name of each **"other"** operator and Form P-5 operator number and, for each operator, all the information required under SECTION 7 of the Form P-17.

## INSTRUCTIONS FOR SECTION 6  PRODUCTION OF ALL OIL WELLS TO BE COMMINGLED.
CHECK the box in SECTION 6 if **all producing wells listed** under all specific oil lease numbers on the proration schedule for the effective month **are being commingled** under this application. If this box is checked, individual well numbers for each oil lease number listed under SECTION 7 do not need to be listed. DO NOT CHECK the box in SECTION 6 if production from only some of the wells under any oil lease number is commingled under this application.

**INSTRUCTIONS FOR SECTION 7   LEASES SHOWN ON PRORATION SCHEDULE.**

DISTRICT: Indicate the Commission district associated with the RRC identifier.

RRC IDENTIFIER: For new applications, list each RRC oil lease or gas ID number to be surface commingled. If the lease or ID number has not yet been assigned, list the drilling permit number of the wells proposed for commingling. If more space is needed, complete the list of leases on an additional page and attach it to Form P-17.

ACTION:   List all existing leases or wells and all wells that are being added to or deleted from the permit and check the appropriate box to indicate the action.

LEASE NAME: Indicate the name of the lease. If the lease identifier is pending, also provide the field name.

WELL NO.:   When only part of the wells on a given oil lease are commingled, list the individual well numbers to be commingled in the "Well No." column. If the wells exceed the space provided, ATTACH a list to the Form P-17. It is not necessary to list the gas well numbers because gas leases only have one well. If all of the wells of an oil lease are being included, the word "all" can be inserted in the "Well No." column as opposed to listing each well.

**COMMISSION APPROVAL OF FORM P-17:**

Upon approval of the Form P-17, the Railroad Commission will mail an approved copy to both the applicant and the gatherer.

Any exception to Statewide Rule 26 or 27 granted by the Railroad Commission through the approval of a Form P-17 is contingent on the applicant obtaining all related required approvals from other affected State Agencies.

In addition, if a protest is registered with the Railroad Commission concerning the installation and/or operation of the facilities approved at any time following approval, the exception to SWR 26 and/or 27 shall be subject to cancellation by the Railroad Commission if, after due notice and hearing, cancellation is justified.

EXHIBIT G

# INSTRUCTIONS  FORM PR: MONTHLY PRODUCTION REPORT    REFERENCE: Statewide Rules 27, 54, 58(b)

**FILING REQUIRED.** File Form PR monthly for all crude oil, casinghead gas, gas well gas, and condensate produced. File Form PR for oil wells for any month there is production, whether the production was prior to or after initial completion, and/or for stock on hand. File Form PR for gas wells from the month of the completion date shown on Form G-1. For recompletions file Form PR from the recompletion date on both oil and gas wells. If the lease is recompleted and there is stock on hand, continue reporting that stock on Form PR under the old RRC Identifier until the stock is disposed of. On reclassified wells, Form PR is due from the month of test as shown on Form G-1 and/or Form W-2.

**WHEN AND WHERE TO FILE.** File the original monthly Form PR with the Commission's Austin Office on or before the last day of the month following the month covered by the Form PR report. Upon the request of any transporter authorized to remove liquid hydrocarbon from the lease, you are required to supply that transporter with copies of all Form PR reports, including corrected reports, until requested to discontinue doing so.

**CORRECTED REPORTS.** Fill in the "CORRECTED REPORT" circle in the upper right-hand corner of Form PR. List ONLY those leases being corrected and provide all identification information and monthly figures (Columns 1-12) for each listed lease.

**ORDER OF THE REPORT AND CERTIFICATION INFORMATION.** File a separate report for each RRC District. List field names alphabetically. Under each field, list lease names in the numerical order of the RRC identifier (drilling permit #, API#, lease #, or gas ID#). Report lease total production and disposition for each lease. For new leases not yet assigned an RRC identifier, use the drilling permit or API number. For multiple page reports covering one district: (a) number the pages sequentially within the district (e.g. page 1 of 15, page 2 of 15,etc.), (b) staple together the pages for the district, and (c) complete and sign the certification section at the bottom of **each page**.

**COMMINGLED PRODUCTION.** Report surface commingling of oil/condensate on Form PR. If a lease is commingled under only one commingle permit number, report the total oil and gas production and disposition for the lease in Columns 1-12, listing the commingle permit number in Column 4. If a lease is commingled under multiple commingle permits, provide the lease total oil and gas production in Columns 1-12, and enter the letter "T" for "Total Production" in Column 4. Directly under the "lease total production," repeat the lease with each commingle permit number (Column 4). Provide the oil/condensate production and disposition volume by commingle permit numbers in Columns 5-9, but do not list gas production for the commingled production breakdown. The total of all oil/condensate volumes by commingle permit must equal the lease total volume line.

**VOLUMES.** Indicate volumes for each lease as monthly totals, in whole numbers, computed by accepted standards of measurement. Do not use decimals, fractions, or negative numbers. See disposition information below.

**OIL/CONDENSATE.** Column 6 is for actual oil/condensate produced. Do not include water or circulating or frac fluids (oil, condensate or refined oil) brought from another lease. Do not show as a disposition any oil/condensate used from stock tanks to frac or treat the same lease until you have determined that the oil/condensate will never be recovered; at which time use oil/condensate disposition Code 74. The volumes in Column 5 plus Column 6 minus Column 7 must equal the volume in Column 9 for each lease. NOTE: If skim liquid hydrocarbons are charged back by a saltwater disposal facility, include the charged volume in Column 6 as oil/condensate production. Show the same volume in Column 7 as a disposition with an oil/condensate disposition Code 8 for skim liquid hydrocarbons.

**CASINGHEAD GAS/GAS WELL GAS.** Report all gas produced regardless of disposition. This includes test production and vented or flared gas, as well as regular production. Use MCF (thousand cubic feet) at base pressure of 14.65 psi and base temperature of 60°F. Under formation production Column 10, show gross production volumes after meter corrections have been applied. Column 10 must equal Column 11 for each lease. You no longer need to report volumes for gas lift gas injected or recovered; however, if you produce gas that is used for gas lift, indicate the initial disposition of that gas using gas disposition Code 5. For gas well gas, you no longer need to convert the condensate production to a gas equivalent volume; the RRC will automatically convert the volume.

**DISPOSITION.** In Column 8, enter an oil/condensate disposition code for each oil/condensate disposition volume shown in Column 7. In Column 12, enter a casinghead gas/gas well gas disposition code for each casinghead gas/gas well gas disposition volume shown in Column 11. You may use more than one code; however, do not use the same code more than once in Column 8 or Column 12 for the same RRC identifier. Show all dispositions according to the initial use or purpose.

| CRUDE OIL/CONDENSATE DISPOSITION CODES: | CASINGHEAD/GAS WELL GAS DISPOSITION CODES: |
|---|---|
| **0 Pipeline** | **1 Lease or field fuel use** – gas used or given to others for field operations including lease drilling fuel, compressor fuel, etc. |
| **1 Truck** | |
| **2 Tank car or barge** | **2 Transmission line** – gas delivered to a transmission line that will not be processed further before ultimate use, including gas used for industrial purposes, irrigation or refinery fuel, etc. |
| **3 Net oil/condensate from commercial tank cleaning** – as calculated on the basis of a shakeout test. Show BS&W as oil/condensate disposition Code 6. Indicate the name of tank service and/or R-2 facility in REMARKS on Form PR. | **3 Processing plant** – total gas delivered to a gas processing plant (any plant or facility reported on Form R-3). Do not report the "plant breakdown" of the gas on Form PR. |
| **4 Circulating oil/condensate** – original movement off lease. File a notification letter with the appropriate district office and Austin. | **4 Vented or flared.** –Indicate why the gas was vented or flared in REMARKS on Form PR. |
| **5 Lost or stolen** – includes loss from fire, leaks, spills, and breaks, as well as theft. File Form H-8 if more than 5 barrels. | **5 Gas Lift** – gas you use, sell or give to others directly for gas lift. Do not include gas delivered to pressure maintenance or processing plants even though it is ultimately used for gas lift. |
| **6 Sedimentation** – BS&W from commercial tank cleaning. Show net oil/condensate as oil/condensate disposition Code 3. Indicate the name of the tank service and/or R-2 facility in REMARKS on Form PR. | **6 Repressure or pressure maintenance** – gas delivered to a system or plant that does not extract liquid hydrocarbons. That system or plant will report on Form R-7. (A pressure maintenance plant or system that does not extract liquid hydrocarbons must file Form R-3. If gas is delivered to a plant or system that recovers liquid hydrocarbons, use casinghead gas/gas well gas disposition Code 3 even though the gas may ultimately be injected for pressure maintenance.) |
| **71 Other – change of operator** | |
| **72 Other – road oil** | |
| **73 Other – lease use** | |
| **74 Other – production lost to formation.** | **7 Carbon black** – gas delivered to a carbon black plant. |
| **75 Other –** Provide an explanation in REMARKS on Form PR. | **8 Underground storage** – gas injected directly into a storage reservoir. |
| **8 Skim liquid hydrocarbons** – as charged back on Form P-18 by a saltwater disposal system. | |

NOTE: Operators wishing to file on continuous feed paper or computer-generated forms or electronically must receive prior approval. Contact the Oil and Gas Division's Production/Permitting Services section for more information.