UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RAYANNE REGMUND, et al.

                Plaintiffs,                CIVIL ACTION NO. 4:16-cv-02960

v.

TALISMAN ENERGY USA, INC.

                Defendant.

### SUPPLEMENTAL DECLARATION OF DAVID BRYAN LERMAN

1. My name is David Bryan Lerman. I am of the age of majority and competent to make this declaration. This is a supplement to my declaration of March 30, 2018.

2. As stated before, I have three degrees including a BSE & MSE in Chemical Engineering (University of Michigan), and a MBA (University of Chicago). I am also a licensed Professional Engineer (Illinois # 062045278) and a Certified Valuation Analyst. I have been employed in or consulted within the oil & gas industry since 1985. I am currently employed as a Managing Director in the Economics and Financial Consulting Practice at FTI Consulting, Inc. in Houston, Texas. A copy of my resume and representative experience was attached as Exhibit A to my original declaration.

3. I have reviewed the Declaration of Mr. Peter D. Huddleston, P.E. ("Mr. Huddleston") of May 8, 2018 ("Huddleston Declaration") and provide my impressions and opinions herein.

4. My overall opinion is that Mr. Huddleston provided conclusory statements and opinions that are misleading, unsupported, inaccurate, and contradictory to both industry standards and the facts in this case. The Huddleston Declaration is not reliable and does not assist the trier of fact.

5. Mr. Huddleston took exception to the fact that Talisman Energy USA, Inc. ("Talisman") applied a shrinkage factor to well production measurements when performing calculations to pay royalties. Mr. Huddleston stated:

> "Talisman has admitted that from March 2014 through February 2016 that the wellhead oil/condensate volumes were adjusted by a "shrink" factor to derive an estimated volume which was the basis for royalty payments.
>
> …

Talisman has stated that the above practice was limited to the Statoil operated properties; however, there is some evidence that Talisman was also shrinking gross production volumes for wells operated by Talisman.

There is no question that the above procedure is a violation of industry standards and practice."[1]

6. Mr. Huddleston did not cite what specific industry standard or practice was violated in the above statements, but did explicitly reference the API *Manual of Petroleum Measurement Standards, Chapter 20* ("MPMS") later in the Huddleston Declaration.

7. The MPMS contradicts Mr. Huddleston. First, the MPMS 20.1 defines *Shrinkage Factor* as:

> **1.7.4 SHRINKAGE FACTOR**
>
> **1.7.4.1 Introduction**
>
> At the allocation measurement point, a hydrocarbon liquid is normally at its bubble point (equilibrium vapor pressure) condition. When this liquid is discharged to a stock tank at atmospheric condition, the light components in the hydrocarbon evaporate, causing a reduction in liquid volume. Therefore, a correction term, defined herein as *shrinkage factor*, may need to be applied to correct the measured liquid volume from metering condition to stock tank condition.

> **1.9.2 SHRINKAGE FACTOR**
>
> Any stream delivering production to a gathering system under pressure will require a volume correction factor to correct to stock tank or atmospheric conditions.

The definition and application of *Shrinkage Factor* described in the MPMS 20.1 was the activity Talisman performed when determining volumes for royalty payments using volumes measured at well conditions in the allocation methodology. Mr. Huddleston's statement regarding violations of standards was erroneous.

8. Talisman employed both volumetric and compositional allocation methodologies depending on the particular hydrocarbon stream and available information. Mr. Huddleston took exception to Talisman's allocation methodologies in several places in the Huddleston Declaration. Mr. Huddleston stated:

> "However, Talisman and [sic] paid royalty on the basis of estimated allocated and shrunk volumes. In addition, the allocation methodologies were neither accurate nor rigorous."[2]

9. Mr. Huddleston also excepted the fact that Talisman applied volumetric allocation methodologies on different hydrocarbon streams and points in time. He stated:

---
[1] Huddleston Declaration, ¶ 10.
[2] Huddleston Declaration, ¶ 9.

"The API Manual of Petroleum Measurement Standards; Chapter 20, Allocation Measurement is commonly relied upon within the industry and supports composition allocation in this instance."[3]

10. Mr. Huddleston had two main concerns. The first concern was selection of the allocation methodology. The second concern was the rigor or precision of the allocation. There are several inaccuracies and omissions in Mr. Huddleston's opinions.

11. The first issue with Mr. Huddleston's opinion was that the industry standard for the allocation methodology specifically in the Eagle Ford is a compositional allocation methodology and he references Mr. Neumann's deposition and the MPMS. Mr. Huddleston did not explain that the MPMS does not endorse or specify any particular allocation methodology and does not specify compositional allocation in the Eagle Ford Shale. What the MPMS 20.3 says about allocation methodology is the following:

> **7.3 Allocation**
>
> One of the most common applications where information on flow rates from individual wells is required is in the allocation (2.1.2) of hydrocarbons that have been commingled. The allocation is based on whatever source of information is at hand—periodic well tests, MPFMs, single-phase meters, VFMs, or any other means. Based on these data, the production that has been accumulated over a given period, measured at a point of relatively high accuracy, is allocated back to the production facilities, leases, units, wells, and well zones from which it was produced.

12. The MPMS says that the allocation is based on *"whatever source of information is at hand"* and goes on to describe various types of information such as periodic well tests, etc. Contrary to Mr. Huddleston's assertion, the MPMS addresses allocation measurements which refer to metering systems to feed an allocation methodology. The MPMS defines allocation measurements as:

> **1.3.1 DEFINITIONS**
>
> a. *Allocation measurement* is measurement using metering systems for individual producing leases or wells and specific procedures to determine the percentage of hydrocarbon and associated fluids or energy contents to attribute to a lease, well, or working interest owner, when compared to the total production from the entire affected reservoir, production system or gathering system.

13. While a number of operators in the Eagle Ford have adopted compositional allocation for very light hydrocarbons; compositional allocation is not required in the API MPMS.

14. While the MPMS does not specify the use of any allocation methodology, the Council of Petroleum Accountants Societies ("COPAS") publishes an Oil Accounting Manual ("OAM") that discusses various allocation methodologies. The OAM discusses allocation methods based on gravity, volume, value, and so forth.[4] Even when each

---
[3] Huddleston Declaration, ¶ 17.
[4] COPAS Oil Accounting Manual, Pages 19-20.

methodology is accurately implemented, different allocation methodologies will render different allocation results. The objective is to provide a reasonable and fair allocation.

15. Statewide Rule 26 embodies the same concept of reasonable and fair allocation. SWR 26 says:

> (3) Reasonable allocation required. The applicant must demonstrate to the Commission or its designee that the proposed commingling of hydrocarbons will not harm the correlative rights of the working or royalty interest owners of any of the wells to be commingled. The method of allocation of production to individual interests must accurately attribute to each interest its fair share of aggregated production.

16. The first three words of the figure above are "reasonable allocation required." Likewise, the last sentence says, "*attribute to each interest its fair share*." However, neither COPAS, nor MPMS nor SWR 26 define any level of precision or what level of accuracy is sufficient to define "reasonable" or "fair". What Mr. Huddleston did not explain is that the reason for the lack of a criterion for precision is because of operational differences among producing fields. For example, the levels of precision of an allocation associated with wells based on semi-annual or monthly well tests are different than the level of precision of an allocation based on continuous measurements. Both situations can be accurate, reasonable, and fair to the interest holders while having different levels of precision.

17. The second issue with Mr. Huddleston's opinions is that he ignored the reallocation and true-up payments. Mr. Huddleston did not explain that after Talisman recognized it may have an issue with the shrinkage, Talisman revisited the past allocations, conducted reconciliations and made two true-up payments totaling $6.1 million to the royalty-interest holders. Mr. Huddleston did not address whether his criticism applied to the reallocations and the true-up payments. In fact, after the true-up payments, Mr. Huddleston did not offer any opinion whether the royalty-interest holders remain underpaid or incorrectly paid.

18. Talisman and its partner, Statoil, invested in multiple co-owned Central Delivery Points ("CDP") to stabilize commingled production from multiple wells. Mr. Huddleston opined that:

> "The use of such centralized facilities with commingled production has become commonplace within the Eagle Ford Shale Trend, but is extremely rare in those cases in which there is a variation in ownership and fluid type".[5]

19. There are three problems with Mr. Huddleston's opinion. The first problem is that the decision to construct CDPs is generally based on an economic cost-benefit analysis rather than ownership structure. The oil & gas industry is capital intensive and working-interest owners look for economies of scale to minimize capital and risk. The second problem

---

[5] Huddleston Report, ¶ 12.

with Mr. Huddleston's opinion is that there are facilities where non-owners enter into contracts and pay for services to process / handle their production. This is a large part of the midstream sector in the oil & gas industry. While differences in ownership add to the accounting complexities, the industry has developed the necessary methods and procedures to handle differences in ownership with ease. The third problem with Mr. Huddleston's opinion is that also he stated that Talisman could have achieved the same level of separation as achieved at a CDP at each well with a second stage of separation.[6] However, Mr. Huddleston did not present any engineering and cost analyses that demonstrate such an investment would have been economical versus the use of CDPs, especially during the 2015-2017 global low crude oil price environment.

20. Mr. Huddleston also opined on the relative volume between flash gas and condensate with the following:

> "Representations of Talisman (and consistent with my experience) is that the aggregate volume of condensate sold at the tailgate of the CDP is less than the combined volume of condensate measured at the individual wells. However, if the volume of condensate sold is less than that metered at the individual wells the volume of raw (unprocessed) gas that is obtained at the tailgate of the CDP would be expected to be greater than the aggregate volume metered at the individual wells."[7]

21. While Mr. Huddleston recognized with the statement above that condensate shrinkage does occur between the well and the tailgate of the CDP, Mr. Huddleston's statement regarding the expected increase in the raw (unprocessed) gas obtained at the tailgate of the CDP is not always correct. Not all of the CDPs have identical process configurations. Some of Talisman's CDPs perform additional operations including but not limited to amine ($CO_2$ removal) treating, dehydration, NGL recovery, etc. These operations impact the volume of gas leaving the tailgate of the CDP. The proper way to determine the expected volume of gas at the tailgate of the CDP is to perform mass and energy balances around the CDP taking into account all of the unit operations of that particular configuration. The situation where Mr. Huddleston's expectation would be correct is if the CDP merely flashed the condensate and did not perform any other unit operations.

22. As discovery may be on-going in this matter, I reserve the right to amend my findings and conclusions as new information is made available to me.

---

[6] Huddleston Declaration, ¶ 19.
[7] Huddleston Declaration, ¶ 12.

I hereby declare this statement to be true and correct under penalty of perjury on the date indicated below:

David Bryan Lerman

Date: 5/23/18