## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| RAYANNE REGMUND, et al. | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:16-cv-02960 |
| | § | |
| TALISMAN ENERGY USA INC. | § | |
| | § | |
| *Defendant*. | § | |

------------------------------------------------------------------------------------------------

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................4

BACKGROUND ................................................................................................4

SUMMARY OF THE ARGUMENT ..................................................................9

ARGUMENT ...................................................................................................10

I.   Legal standard. ..........................................................................................10

II.  The Court should grant final approval of the Settlement Agreement. ..........11

    A.   The class representative and class counsel have adequately represented the class members. ....................................................................................12

    B.   The Settlement Agreement is the product of extensive arm's-length negotiations between experienced counsel with the help of a respected third-party mediator. ..................................................................................15

    C.   The relief provided in the Settlement is adequate under the Rule 23(e)(2)(C) factors ....................................................................................    16

        1.   Costs, risks, and delay of trial and appeal....................................17

        2.   The effectiveness of the method for distributing relief to the class19

        3.   The proposed award of attorneys' fees is fair and adequate ..........20

    D.   The Settlement Agreement treats class members equitably relative to each other. ...................................................................................…  21

    E.   The Settlement Class has collectively reacted positively to the settlement ....23

III. The notice and opt-out process was the best practicable under the circumstances..23

IV.  The Plan of Allocation should be approved in order to effectuate the Settlement Agreement. .................................................................................26

CONCLUSION.................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

*Ayers v. Thompson*,
358 F.3d 356, 369 (5th Cir. 2004) ...........................................................13, 14

*Burnett v. Conseco Life Insurance Co.*,
No. 118CV00200JPHDML, 2020 WL 4207787, at *9 (S.D. Ind. July 22, 2020 .............19

*Cole v. Collier*,
No. 4:14-CV-1698, 2018 WL 2766028, at *4 (S.D. Tex. June 8, 2018)
(citations omitted); .........................................................................12, 15

*DeHoyos v. Allstate Corp.*,
240 F.R.D. 269, 292 (W.D. Tex. 2007) .....................................................20

*In re Chinese-Manufactured Drywall Products Liability Litigation*,
424 F. Supp. 3d at 490 (quoting Fed. R. Civ. P. 23(e)(2)(C), (D),
2018 Advisory Committee Notes) ............................................................18

*In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig.*,
851 F. Supp. 2d 1040, 1064 (S.D. Tex. 2012) ..............................................15

*In re Prudential-Bache Energy Income Partnerships Securities Litigation*,
No. CIV. A. MDL-0888, 1995 WL 8007, at *2 (E.D. La. Jan. 3, 1995) ..........................23

*In re Signet Jewelers Limited Securities Litigation*,
No. 1:16-CV-06728-CM-SDA, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020).....19

*In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1262 (D. Kan. 2006).  ...............23

*Johnson v. Ga. Highway Express, Inc.*,
488 F.2d 714 (5th Cir.1974...................................................................17

*Kemp v. Tower Loan of Miss., LLC*,
No. 3:15-CV-499-CWR-LRA, 2017 WL 6522323, .......................................................23
*Leung v. XPO Logistics, Inc.*,
326 F.R.D. 185, 198 (N.D. Ill. 2018)........................................................12

*Morgan v. Pub. Storage*,
301 F. Supp. 3d 1237, 1248 (S.D. Fla. 2016) ................................................12

*O'Donnell v. Harris County, Tex.*,
No. CV H-16-1414, 2019 WL 6219933, at *9 (S.D. Tex. Nov. 21, 2019)..............8, 12, 15

*Parker v. Anderson,*
667 F.2d 1204, 1209 (5th Cir. 1982)) ............................................................... 15

*Reed v. General Motors Corp.,*
703 F.2d 170, 172 (5th Cir. 1983) ........................................................ 6, 7, 9, 14

*Reedy SBMC Healthcare, L.L.C. Blackwell v. SBMC Healthcare, L.L.C.,*
No. 4:12-CV-01324, 2013 WL 12157165, at *1 (S.D. Tex. Mar. 7, 2013 ....................... 23

*Seeligson v. Devon Energy Prod. Co., L.P.,*
753 F. App'x 225 (5th Cir. 2018) ..................................................................... 10

*Slade v. Progressive Security Ins. Co.,*
856 F.3d 408, 412 (5th Cir. 2017 ...................................................................... 9

*Unger v. Amedisys Inc.,*
401 F.3d 316, 321 (5th Cir. 2005) ..................................................................... 9

*United States v. City of New Orleans,*
731 F.3d 434, 438-39 (5th Cir. 2013) ................................................................. 7

**Rules**
Federal Rules of Civil Procedure
    Fed. R. Civ. P. 23 ................................................................................. 4, 6
    Fed. R. Civ. P. 23(a) .............................................................................. 4
    Fed. R. Civ. P. 23(e)(2) ......................................................... 6, 7, 8, 9, 12, 13
    Fed. R. Civ. P. 23(e)(3) ........................................................................... 7
    Fed. R. Civ. P. 23(c)(2) .......................................................................... 23
    Fed. R. Civ. P. 23(c)(2)(b) ............................................................... 8, 20, 21
    Fed. R. Civ. P. 23(e)(2)(A) ............................................................... 9, 12, 20
    Fed. R. Civ. P. 23(g)(A) ......................................................................... 10
    Fed. R. Civ. P. 23(g) ............................................................................. 10
    Fed. R. Civ. P. 23(e)(2)(B) .................................................................... 9,12
    Fed. R. Civ. P. 23(e)(2)(C) ............................................................ 13, 14, 16, 18
    Fed. R. Civ. P.  23(e)(2)(C)(i) .................................................................. 14
    Fed. R. Civ. P.  23(e)(2)(C)(ii) ................................................................. 16
    Fed. R. Civ. P. 23(e) ............................................................................. 16
    Fed. R. Civ. P. 23(e)(2)(C)(iii) .............................................................. 17, 18
    Fed. R. Civ. P. 23(e)(2)(D ....................................................................... 18
    Fed. R. Civ. P. 23(e)(3) .......................................................................... 18
    Fed. R. Civ. P. 23(e)(2)(C)(iv) .................................................................. 18
    Fed. R. Civ. P. 23(c)(2)(b) ....................................................................... 20
    Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii) .............................................................. 21

## INTRODUCTION

On December 9, 2020, the Court granted preliminary approval of the Settlement, finding, among other things, that the Settlement was sufficiently fair, reasonable, and adequate to warrant sending Notice of the Settlement to the Settlement Class.[1] Nothing has changed in the few months since the Court endorsed the Settlement in its order granting preliminary approval of the Settlement (Doc. 221) that would cast doubt on those preliminary findings and conclusions. For the reasons discussed below, the Settlement, Notice of Settlement, and Plan of Allocation are fair, reasonable, and adequate. Given the extraordinary results obtained in the Settlement for Participating Class Members in light of the risk of continuing with this litigation, the Settlement meets and exceeds the standard for final class action settlement approval. The time has come to bring this hard-fought litigation to a just and equitable end through final approval of the Settlement.

## NATURE OF THE CASE AND STAGE OF PROCEEDINGS

As the Court will recall, this lawsuit involves allegations that Talisman improperly calculated royalties owed to Plaintiffs and other similarly situated oil and gas leaseholders with leases in the Eagle Ford shale. Doc. 1, 61. Plaintiffs allege Talisman breached the leases by "using volumetric allocation instead of a compositional allocation that accounts for actual well production and estimating shrinkage factors." Doc. 172 at 9. Talisman denied that it breached any leases. Further, in the event that it was determined that it had miscalculated royalty payments, Talisman asserted recoupment in the nature of offset as an affirmative defense, asserted a counterclaim for

---

[1] Capitalized terms used herein have the meaning given to them in the Stipulation and Agreement of Settlement ("Settlement Agreement" or "S.A.") (Doc. 206), unless otherwise noted. The proposed Plan of Allocation is Exhibit 1 to the Settlement Agreement (referenced herein as "S.A., Exhibit 1"), and the proposed form of Notice of Settlement is Exhibit 4 ("S.A., Exhibit 4").

recoupment, and proposed to assert against any certified class recoupment of any overpayments to royalty interest owners.  Doc. 79.

Following almost five years of active litigation, multiple mediations with retired Judge Royal Furgeson, and subsequent, extensive negotiations under his guidance, Talisman and Plaintiffs reached a Settlement Agreement to resolve this case in its entirety on a class-wide basis. The Settlement Agreement provides significant and direct monetary benefits to Participating Class Members through two key provisions.

*First*, the Settlement provides an actual cash fund of $24,428,573.  *See* Declaration of Bryan O. Blevins, Jr., at ¶10, 14 and Declaration of Joseph N. Kravec, Jr., at ¶8, 12 filed herewith as Exhibits A & B respectively.  While Defendant originally paid $27 million into a fund, an estimated[2]  $2,571,427 will revert to Defendant, as this money was allocated to those Class Members who opted out of the Settlement or were excluded from the Settlement because they previously released or adjudicated the claims released in the Settlement Agreement ("Non-Participating Class Members").  Doc. 206, S.A. at ¶¶ 2.1, 1.37; Doc. 206-1, Plan of Allocation ¶ 4. Importantly however, this refund will not impact the recovery of Participating Class Members, who will receive at least the same recovery regardless of the refund attributable to Non-Participating Class Members.

Pursuant to the Plan of Allocation, the $24,428,573 fund will be used to pay Participating Class Members for the alleged underpayment of royalties based upon the industry-recognized Equation of State Model (hereafter, "EOS Model"), which reallocated historic sales volumes of condensate and flash gas among Talisman's wells in the Eagle Ford based on the compositional

---

[2] The Non-Participation Refund is estimated because the actual amount can only be ascertained after the Court awards any attorneys' fees, expenses, and case contribution awards.  Doc. 206, S.A., Exhibit 1, Plan of Allocation ¶ 5.

profile of each well, in a fair, equitable, and reasonable manner among royalty interest owners. Doc. 206, S.A. at ¶ 4.2; Doc. 206-1, S.A., Exhibit 1, Plan of Allocation at ¶¶ 2, 3; Doc. 207-2, Decl. of Peter Huddleston at ¶ 22.   This fund will also pay for (i) the costs of settlement administration, notice of settlement, and distribution of settlement payments, (ii) Plaintiffs' attorneys' fees and costs to the extent awarded by the Court, and (iii) case contribution awards for named Plaintiffs Rayanne Regmund Chesser and Gloria Janssen to the extent awarded by the Court. Doc. 206, S.A. at ¶¶ 1.27, 1.34.[3]

*Second*, in addition to that affirmative payment, Talisman will release all Participating Class Members from any claim for recoupment or defensive offset for any overpayment of royalties as a result of a re-allocation or re-computation of royalties. *Id.* at ¶¶ 1.10, 3.1.   As the Court recognized, to the extent any class member was underpaid, another class member or members would have been overpaid, but through this Settlement, Talisman has agreed to release and not recoup from Participating Class Members any amounts that have been overpaid. *Id.*   All told, Talisman's release of its overpayment claims provides another $12,278,435 in royalties that Participating Settlement Class Members have already received and will be entitled to keep as calculated by the EOS Model. Doc. 206, S.A. at ¶¶ 1.10, 3.1; Doc. 206-1, S.A., Exhibit 1, Plan of Allocation at ¶ 3(b); *See* Blevins Declaration at ¶12, 14; Kravec Declaration at ¶10, 12.   When these significant monetary benefits are added to the some $4 million in "true up" payments Talisman made to certain underpaid leaseholders in 2016 and 2017, *see* Doc. 173-6, Plaintiff's litigation efforts have resulted in a significant recovery above the $24,428,573 cash fund.[4]   Thus,

---

[3] Plaintiffs have filed a separate Motion for Attorneys' Fees, Litigation Expenses, and Case Contribution Awards.

[4] Inasmuch as these payments to leaseholders could ultimately be considered "overpayments" if royalty payments were recalculated at trial, it bears mentioning that any recoupment of these "true up" payments by Talisman is likewise released against Participating Class Members.

the Settlement Agreement provides Participating Class Members with an affirmative cash recovery in excess of $24 million while also permitting them to keep over $12 million in royalty payments that have already been paid to them which could, absent this Settlement, be contested and recouped by Talisman.

Following briefing and two hearings, the Court granted preliminary approval of the proposed Settlement by Order dated December 9, 2020 ("Preliminary Approval Order"). Doc. 221. Among other findings, the Court preliminarily found that the Settlement Agreement "resulted from extensive arm's-length negotiations" and is "fair, reasonable, and adequate." Doc. 221 at 7. The Court also found that "the proposed manner of communicating the Notice of Settlement to the Settlement Class" constitutes "the best notice practicable under the circumstances, constitutes due and sufficient notice to all persons and entities entitled to receive such notice, and fully satisfies the requirements of applicable laws, including due process and Federal Rule of Civil Procedure 23." Doc. 221 at 9. The Court certified the Settlement Class, defined as:

    a.   All persons who received or were entitled to receive Royalty payments from Talisman attributable to Production within the Eagle Ford Area occurring during the Claim Period (i.e., between January 1, 2013 and June 1, 2016) that was commingled with Production from one or more other wells, and to whom Talisman paid such Royalties using a volumetric allocation methodology on net production sold and/or estimated "shrunk" production volumes.

    b.   Excluded from the class are (a) all governmental entities, including federal, state, and local governments and their respective agencies, departments, or instrumentalities; (b) any foreign citizens, states, territories, or entities; (c) owners of any interests and/or leases located on or within any federally created units; (d) owners of any non-operating working interest for which Talisman or its agents or representatives, as operator, disburses royalty; (e) Talisman, Statoil, and any entity in which Talisman or Statoil has a controlling interest, and their officers, directors, legal representatives, and assigns; and (f) members of the judiciary and their staff to whom this action is assigned.

Doc. 221 at 2.[5]

In accordance with the Preliminary Approval Order, the Settlement Administrator (1) mailed the approved Notice of Settlement by first class mail to potential Class Members in December 2020 and (2) displayed information regarding the Settlement Agreement on an Internet website, which further allowed Class Members to access an approximation of their potential allocation from the Gross Settlement via a secure, claimant-only portal.  Declaration of Settlement Administrator Frank Trani ¶ 4, attached here to as Exhibit C.   Since the website's launch, there have been over 500 page views of the website.  *Id.* ¶ 6.  The Settlement Administrator and Plaintiffs' Counsel have addressed over 180 telephone calls regarding the Settlement Agreement. Trani Decl. ¶ 6; Blevins Decl. ¶72.

The overwhelming majority of the Settlement Class has tacitly endorsed the Settlement. Of the 2780 Class Members, only 26 Class Members submitted a Request for Exclusion—*i.e.*, less than 1% of the Settlement Class.  Trani Dec. ¶ 7.  In addition, the parties agreed to the exclusion of 17 Class Members (2 of whom had already submitted Requests for Exclusion) from the Settlement Class based on Talisman's prior settlements or judgments involving those individuals. *Id.*   The final list of Non-Participating Class Members who submitted a Request for Exclusion and/or were excluded as a result of a prior settlement or judgment is attached as Exhibit D.   And since the Court issued its Preliminary Approval Order, there have been no objections to the Settlement.[6]

---

[5] When Court certified the Settlement Class it found that all requirements of Fed. R. Civ. P. 23(a) and (b)(3) were met. Doc. 221 at 2-7.  Thus, Plaintiffs will not re-brief the class certification issues herein.

[6] While the Newberry Plaintiffs filed an opposition to Plaintiffs' Motion for Class Certification, see Docs. 210 and 218, those motions were filed before the Court's December 8, 2020 hearing on preliminary approval and its Preliminary Approval Order.  Since then, the Newberry Plaintiffs have opted out of the Settlement.

On behalf of the Settlement Class, Plaintiffs now request final approval of the Settlement Agreement, as set forth in the attached proposed order.

## SUMMARY OF THE ARGUMENT

The Settlement Agreement, Notice of Settlement, and Plan of Allocation are fair and reasonable. The Settlement Agreement readily merits approval in light of the considerations laid out in Federal Rule of Civil Procedure 23(e)(2) as well as the Fifth Circuit's decision in *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983). First, the class representatives and class counsel have vigorously and adequately represented the class members. Second, the Settlement Agreement is the product of extensive arm's-length negotiations between experienced counsel, as confirmed by the former federal judge who acted as mediator, and was reached only after the parties had engaged in protracted and hard-fought litigation, circumstances which bely any notion of a collusive agreement. Third, the relief provided in the Settlement Agreement constitutes an excellent outcome in light of the risks of litigation, the time and expense that would be required to litigate the case to a successful conclusion, and the damages at issue. The Settlement awards Participating Class Members *more* than the total amount of underpayments calculated by the EOS Model and releases them from any claim for overpayment of royalties as a result of a re-allocation or re-computation of royalties—and does so even after the Court declined to certify a litigation class. Fourth, the Settlement Agreement and Plan of Allocation equitably divides that substantial recovery among the Participating Class Members by tying compensation to the size of each Participating Class Member's calculated underpayment and providing a baseline monetary award to all. Finally, Class Counsel and Plaintiffs strongly endorse the Settlement, and to date, there have been no objections by Participating Class Members since the Court issued its Preliminary Approval Order.

The notice and opt-out process passes muster as well.  As the Court found when it granted preliminary approval, the "the Notice of Settlement to the Settlement Class . . . is the best notice practicable under the circumstances, constitutes due and sufficient notice to all persons and entities entitled to receive such notice, and fully satisfies the requirements of applicable laws, including due process and Federal Rule of Civil Procedure 23." Doc. 221 at 9.  The passage of time has only further confirmed those conclusions, as the notice and opt-out process proceeded smoothly and according to plan.

The Court should now grant final approval of the Settlement Agreement, Notice of Settlement, and Plan of Allocation.

## ARGUMENT

## I.   Legal standard.

To secure final approval, the proposed settlement must be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *United States v. City of New Orleans*, 731 F.3d 434, 438-39 (5th Cir. 2013).  Under the 2018 amendments to the Federal Rules of Civil Procedure, courts evaluating proposed class action settlements should examine whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

10

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Prior to the Federal Rules' inclusion of specific "fairness" factors, the Fifth Circuit laid out a set of six factors in *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983), that likewise bear on whether a class settlement is fair and reasonable: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members. *Id.*   In this memorandum, Plaintiffs will first focus on Fed. R. Civ. P. 23(e)(2) and address relevant *Reed* factors in the context of that analysis as they substantially overlap with Rule 23(e)(2). *See O'Donnell v. Harris County, Tex.*, No. CV H-16-1414, 2019 WL 6219933, at *9 (S.D. Tex. Nov. 21, 2019). ("The goal of this amendment [to Rule 23(e)(2)] is not to displace any [circuit case-law] factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.") (quoting Fed. R. Civ. P. 23(e)(2) Committee Notes to 2018 amendments).

An additional requirement for approval under Rule 23(e) is that the class settlement must "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(b).

## II.   The Court should grant final approval of the Settlement Agreement.

The Court has already granted preliminary approval of the Settlement Agreement, preliminarily finding that, *inter alia*, the Settlement Agreement "resulted from extensive arm's-length negotiations" and is "fair, reasonable, and adequate." Doc. 221 at 7. Those findings

likewise support final approval, as do the extensive evidence and law that demonstrate the Settlement Agreement's meets the standard for final approval in light of the governing Rule 23(e)(2) approval factors and those enumerated in *Reed.*

**A.    The class representative and class counsel have adequately represented the class members over five  years of intensely contested litigation.**

The first Rule 23(e)(2) factor asks whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A).  That adequacy inquiry can be broken up into three subcategories: (1) "the zeal and competence of the representative[s'] counsel"; (2) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees"; and (3) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v. Progressive Security Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017).  To meet the adequacy requirement, "the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

This inquiry (as well as the "fraud and collusion" inquiry addressed in the next section) also implicates the third *Reed* factor, that is, "the stage of the proceedings and the amount of discovery completed." *Reed*, 703 F.2d at 172; *See* Fed. R. Civ. P. 23(e)(2) Committee Notes to 2018 amendments ("the focus at this point [under Rule 23(e)(2)(A) and (B)] is on the actual performance of counsel acting on behalf of the class. . . . in assessing these topics . . .  the nature and amount of discovery . . .  may indicate whether counsel negotiating on behalf of the class had an adequate information base").  As to the first "adequacy" subcategory regarding the competency of class counsel, the named Plaintiffs chose attorneys Bryan O. Blevins, Jr. and Michael Hamilton of Provost Umphrey Law Firm, LLP and Joseph N. Kravec, Jr. and Wyatt A. Lison of Feinstein

Doyle Payne & Kravec, LLC.  As the accompanying declarations of Bryan O. Blevins, Jr. and

Joseph N. Kravec, Jr. demonstrate, Provost Umphrey Law Firm, LLP and Feinstein Doyle Payne

& Kravec, LLC are firms with extensive experience prosecuting class actions and complex cases,

possess the requisite knowledge of the applicable law, and have committed the resources necessary

to prosecute this case on behalf of the named Plaintiffs and the Settlement Class to a successful

conclusion.  *See* Blevins Decl. ¶17-23,77; Kravec Decl. ¶14-23.  Plaintiffs' Counsel devoted a

significant amount of time to this matter to prosecute this case on behalf of the named Plaintiffs

and the Settlement Class to a successful conclusion, including (among other things), extensive

discovery, and briefing and arguing Plaintiffs' motion for class certification, the impact of the Fifth

Circuit's ruling in *Seeligson v. Devon Energy Prod. Co., L.P.,* 753 F. App'x 225 (5th Cir. 2018),

and summary judgment.  *See* Blevins Declaration at ¶24-82; Kravec Declaration at ¶24-49.  After

the Court formally named these attorneys as class counsel in its certification order,[7] Plaintiffs'

Counsel have continued to communicate with and work on behalf of the Settlement Class

throughout the notification and opt-out process.  Accordingly, Plaintiffs' Counsel satisfy the

requirements of Rule 23(g).

    As to the second subcategory, Plaintiffs understand the allegations made in this action, the

terms of the Settlement Agreement, and their obligations to the proposed Settlement Class and

have been willing and able to zealously represent the class.  Each of them read the complaints

before they were filed; confirmed their claims are based on Talisman's alleged failure to pay

---

[7] In appointing class counsel, the Court considered:
> (i) the work counsel has done in identifying or investigating potential claims in
> the action; (ii) counsel's experience in handling class actions, other complex
> litigation, and the types of claims asserted in the action; (iii) counsel's knowledge
> of the applicable law; and (iv) the resources that counsel will commit to
> representing the class.

Fed. R. Civ. P. 23(g)(A).

royalties based on the amount of gas/oil sold or saved, as are the claims of all proposed Settlement Class members; confirmed their understanding of their responsibilities to the proposed class; and retained competent counsel with sufficient resources to prosecute this action to conclusion. *See* Blevins Decl. ¶ 88-89.

Finally, as to the third category—the risk of class conflicts—the Settlement Agreement forecloses the risk of any conflict. It does so by assuring that there will be no "losers" and that all Participating Class Members will instead be "winners." First, *all* Participating Class Members will receive a payment based on the amounts of any underpayments, as determined by the compositional reallocation under the EOS Model, and in all events will receive at least $150. Doc. 206-1, S.A., Exhibit 1, Plan of Allocation at ¶ 5. Second, Talisman will waive its right to recoup or offset from any Participating Class Member any overpayments under the re-allocation or re-computation of royalties or reduce the amount of settlement funds allocated to those individuals based on the overpayments. Doc. 206, S.A. at ¶ 3.1. That waiver benefits all Participating Class Members, whether they were overpaid on a cumulative basis over the entire time period, or simply overpaid for certain months. Third, every Class Member has now had the opportunity to make an informed decision on whether to opt out of the Settlement because each Class Member was provided an opportunity to review an approximation of their potential recovery. Blevins Decl. ¶ 71-72; Trani Decl. ¶ 6. In these ways, the Settlement goes beyond merely eliminating an intraclass conflict (for example, by ensuring that the overpaid class members would not be subjected to financial liability) and actually provides an affirmative monetary benefit to all Participating Class Members, regardless of whether they may have been overpaid, in part or overall.

More to the point, the real proof of Plaintiffs' and their counsels' adequacy is in the

pudding—the tremendous value provided by the Settlement is dispositive evidence of the excellent representation received by the Settlement Class.

**B.       The Settlement Agreement is the product of arm's-length negotiations between experienced counsel with the help of a respected third-party mediator after extensive discovery and motions practice.**

The second Rule 23(e)(2) factor asks whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).  This factor echoes the first *Reed* factor, that is, "the existence of fraud or collusion behind the settlement," and as discussed above, implicates the third *Reed* factor as well.  *See* Fed. R. Civ. P. 23(e)(2) Committee Notes to 2018 amendments (Rule 23(e)(2)(A) and (B) "identify matters that might be described as 'procedural' concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement.")."The Court may presume that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary."  *Cole v. Collier,* No. 4:14-CV-1698, 2018 WL 2766028, at *4 (S.D. Tex. June 8, 2018) (citations omitted); *O'Donnell*, 2019 WL 6219933, at *10.  This presumption is bolstered where the settlement was achieved through mediation with a former judge.  *See Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 198 (N.D. Ill. 2018) (settlement merited approval because it "was reached after three mediation sessions with two exceptional mediators, both of whom are former federal judges"); *Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1248 (S.D. Fla. 2016) (settlement was negotiated at arm's length where "[t]he Parties participated in two mediations conducted by separate mediators, both of whom were former judges").

Here, there is not a scintilla of evidence that the Settlement resulted from collusion or fraud. To the contrary, this case's arduous history reveals that both sides have worked tirelessly for almost five years to protect their respective interests.  *See O'Donnell*, 2019 WL 6219933, at *10 ("The record of many, many hearings; the bench trial; the several appeals; and the lengthy, difficult negotiations, amply demonstrate the zealous advocacy that all sides deployed.").

Additionally, "[c]ompletion of discovery and significant litigation weigh in favor of a finding that the Settlement is fair, reasonable, and adequate.  When discovery has been completed and legal issues decided, the parties and the court have sufficient information with which to evaluate the merits of their positions." *Cole*, 2018 WL 2766028, at *5 (citing *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004)).  Here, there has been extensive discovery, including five corporate witness depositions and production and review of over 600,000 pages of documents. *See* Blevins Decl. at ¶ 37-47.  Moreover, the testimony of several expert witnesses was presented to this Court as part of the three class certification hearings.  The parties also fully briefed and argued the class-certification issues, *see, e.g.*, Doc. 172, and briefed the merits of Talisman's counterclaim for recoupment on summary judgment.  *See* Docs. 173, 177, 179.  These efforts enabled the parties to meaningfully evaluate their respective positions when negotiating the Settlement.  Moreover, these are circumstances which clearly demonstrate the adversarial nature of this case and belie any possibility of collusion in reaching the Settlement.

Finally, the Settlement was reached only after mediation with an experienced neutral, Judge Royal Furgeson, and following a mediator's proposal.  Judge Furgeson has appeared before the Court on multiple occasions—including at the preliminary-approval hearing—to voice his categorical endorsement of the Settlement Agreement and the process through which it was achieved. *See, e.g.*, Doc. 214, Oct. 27, 2020 H'rg. Tr. at 7:15-8:7 ("[T]he settlement is the product of serious, informed and noncollusional negotiation.").

### C.    The relief provided in the Settlement is adequate under the Rule 23(e)(2)(C) factors.

The third Rule 23(e)(2) factor asks whether "the relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2)(C).  Rule 23(e)(2)(C) provides a list of four non-exclusive factors to guide that analysis, and the four remaining *Reed* factors can fairly be said to be subsumed within this

analysis as well.   Each demonstrates that the Settlement Agreement is more than adequate, especially when considering this case's procedural history and current posture.

### 1. Costs, risks, and delay of trial and appeal.

The first Rule 23(e)(2)(C) factor concerns "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i).   The Fifth Circuit's six-factor *Reed* analysis includes three factors which are implicated by this Rule 23 factor: *Reed* directs the Court to consider the merits of the Settlement in light of "the complexity, expense, and likely duration of the litigation" (factor two), the "the probability of plaintiffs' success on the merits" (factor four), and "the range of possible recovery" in the absence of settlement (factor five).   *See Reed*, 703 F.2d at 172.

"When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *O'Donnell*, 2019 WL 6219933, at *11 (citing *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004)).   This case's history makes clear there are significant costs and risks associated with prosecuting this action to trial.   As the Court knows, class certification was initially denied and the class was certified only after the Settlement Agreement cured the shortcomings that initially prevented class certification.   Doc. 172; *see* Doc. 205 at 2.

It is true that Plaintiff Regmund Chesser's motion for partial summary judgment is still pending and that Plaintiffs would likely move again for class certification if it were granted.   But the outcome of both motions would be uncertain.   In any case, success on those motions would achieve only what the Settlement Agreement has already accomplished—a certified class— without any guarantee of a successful recovery under Plaintiffs' theory of the case.

The Settlement Agreement, in contrast, provides significant and guaranteed monetary relief without the uncertainty of a decision on the partial summary judgment motion, a potential second motion for certification of a litigation class (if Plaintiffs were to succeed on the partial summary

judgment motion), and dispositive motions on Plaintiffs' claims.  The Settlement also avoids all the additional risks—and corresponding delays—of trial and appeal.  This strongly favors approval of the Settlement.  *See Cole*, 2018 WL 2766028, at *4 ("Absent settlement, the litigation would almost certainly have continued for years, with no assurance of as favorable a resolution."); *In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig.*, 851 F. Supp. 2d 1040, 1064 (S.D. Tex. 2012) ("When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened.").

The uncertainty as to the merits outcome of the case further confirms the Settlement Agreement's substantial value.  *See Cole*, 2018 WL 2766028, at *5 ("The probability of the Plaintiffs' success on the merits is the most important factor for courts to consider when evaluating a class action settlement." (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)); *O'Donnell*, 2019 WL 6219933, at *13 (discussing related *Reed* factor that "requires the district court to establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors . . . taking into account the challenges to recovery at trial that could preclude the class from collecting altogether.").  For example, at trial the jury would have been tasked with determining whether Talisman's allocation was reasonable and accurate based on lease language and industry custom.  The dueling experts at the initial class-certification hearings demonstrate that this core issue would be hotly contested. *See generally* Doc. 155, March 28, 2019 Hr'g. Tr.; Doc. 158, March 29, 2019 Hr'g. Tr.  And Plaintiffs would have to prevail not only on that issue, but also on a host of other heavily disputed points in order to win at trial.

The Settlement Agreement eliminates those risks. It guarantees that all Participating Class Members will receive payments; as a group, they will receive over 100% of the amount of actual aggregate underpayments computed by the EOS Model. As discussed, the Settlement fully compensates each Participating Class Member for their alleged royalty underpayments and ensures each will receive at least a minimum payment of $150 per person. The Settlement confers the additional benefit of immunity from Talisman's claims for recoupment or offsetting of future royalty payments based on a re-allocation or re-computation of royalties. Most importantly, the Settlement achieves this result while avoiding the following possibilities: (i) that no litigation class is ever certified and the proposed Class Members who cannot afford to pursue individual litigation are never compensated for the alleged royalty underpayments; (ii) that even if a class were certified, Plaintiffs lose on the merits; (iii) that even in the event of success on the other elements, some Class Members are determined to have no damages; and (iv) that Class Members would be subject to a claim for recoupment by Talisman and could actually be required to pay money to Talisman. Again, the Settlement Agreement avoids all of these negative possibilities while also providing full recompense for the royalty underpayments alleged in this lawsuit.

### 2. The effectiveness of the method for distributing relief to the class.

The second Rule 23(e)(2)(C) factor concerns "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes. "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*

The Settlement Agreement provides for a fair and streamlined method of distributing relief and critically, requires no affirmative effort by Participating Class Members to obtain money relief

or protection from recoupment.  Following the Court's final approval of the Settlement, and in accordance with the Settlement Agreement, the Settlement Administrator will provide the Parties the Final Schedule of Distribution of the Net Settlement Fund to Participating Class Members, showing the final distribution amounts for each Participating Class Member.  Doc. 206, S.A. at ¶ 8.1.  Such payments shall be calculated based on the agreed-upon EOS Model.  Doc. 206-1, S.A., Exhibit 1, Plan of Allocation at ¶ 3.  Plaintiffs will then file a motion with the Court seeking approval of a Distribution Order that distributes the Net Settlement Amount according to the Final Schedule of Distribution.  Doc. 206, S.A. at ¶ 8.2.  Upon and only upon the Court's issuance of the Distribution Order, Participating Class Members will receive automatic check payments without requiring anything from them other than cashing the check.  Doc. 206-1, S.A., Exhibit 1, Plan of Allocation at ¶ 3.  Nor will such class members have to take any affirmative action to benefit from Talisman releasing them from any overpayment claims—the Settlement Agreement is self-executing in that regard.  In short, the Settlement Agreement sets up an efficient and fair process for distributing the settlement funds among the Participating Class Members.

### 3.  The proposed award of attorneys' fees is fair and adequate.

The third Rule 23(e)(2)(C) factor concerns "the terms of any proposed award of attorney's fees, including timing of payment."  Fed. R. Civ. P. 23(e)(2)(C)(iii).  As provided in the Settlement Agreement, Plaintiffs are seeking $9 million in attorneys' fees, and $975,000 in litigation expenses and case contribution awards.  Doc. 206, S.A. at ¶ 9.1.  As set forth in greater detail in the separately filed Plaintiffs' Motion for Attorneys' Fees, Litigation Expenses, and Case Contribution Awards, the requested attorneys' fee is fully merited because it amounts to less than 25% of the Settlement's total monetary value, well below the 30% "benchmark" for percentage fee awards approved in common fund class settlements such as this one.  Moreover, a review of the relevant factors from *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974) and the *actual* attorneys' fees

of over $4.2 million accrued by Class Counsel on 5,097.8 hours of their professional time over the past 6 years only bolsters the reasonableness of the request, as the Settlement provides an outstanding recovery to impacted Participating Class Members and the fee award results in a relatively modest 2.1 multiplier to Class Counsel. *See* Blevins Decl. ¶76-79; Kravec Decl. ¶33-49. The litigation expenses and case contribution awards sought are also merited.     And as to the "timing of payment," Fed. R. Civ. P. 23(e)(2)(C)(iii), the Settlement Agreement provides that Plaintiffs' Counsel's fees will not be paid until the Participating Class Members are also paid, thereby aligning their interests, *see* Doc. 206, S.A. at ¶¶ 8.4, 9.2.[8]  Moreover, after deducting the requested attorneys' fees and expenses from the cash fund of $24,428,573, Participating Class Members will still receive at least 100% of their royalty underpayments computed by the EOS Model, and additionally benefit by the waiver of any recoupment of overpayments.

### D.       The Settlement Agreement treats class members equitably relative to each other.

The fourth Rule 23(e)(2) factor asks whether "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "This inquiry involves a determination of 'whether the apportionment of relief among class members takes appropriate account of differences among their claims.'"  *In re Chinese-Manufactured Drywall Products Liability Litigation*, 424 F. Supp. 3d at 490 (quoting Fed. R. Civ. P. 23(e)(2)(C), (D), 2018 Advisory Committee Notes).  "It is perfectly fair and reasonable, and indeed common and accepted, for settlement benefits to turn on the strength of class members' claims."  *Id.* at 492.

---

[8] Rule 23 also invites the court to consider "any agreement made in connection with the [settlement] proposal."  Fed. R. Civ. P. 23(e)(3); *see also* Fed. R. Civ. P. 23(e)(2)(C)(iv).  There are no such agreements here.

The Settlement Agreement provides for a Plan of Allocation whereby the EOS Model will be used to determine each Participating Class Member's individual underpayment of royalties. Plaintiffs' expert has reviewed this EOS Model and determined that it provides a fair allocation for royalty owners. Doc. 207-2, Huddleston Decl. ¶¶ 14-20, 22. The money allocated to each Participating Class Member as a percentage of the total fund available to all such Class Members will be proportional to the value of that Class Member's underpayment as a percentage of total underpayments, subject to the rule that the minimum payment will be $150 per person (to the extent that an individual's payment must be increased to reach the minimum payment of $150, the funds needed to pay for that increase will be borne proportionally by all Class Members that stand to recover $200 or more). Doc. 206, S.A., Exhibit 1, Plan of Allocation at ¶ 5(b). This Plan of Allocation will ensure that all Participating Class Members' recovery will exceed their underpayments as determined by the EOS Model.

This is an eminently fair and reasonable way to allocate money amongst the group based on the harm that each class member suffered as a result of Talisman's alleged breach. *See In re Signet Jewelers Limited Securities Litigation*, No. 1:16-CV-06728-CM-SDA, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020) (factor met where "eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their transactions in Signet common stock"); *Burnett v. Conseco Life Insurance Co.*, No. 118CV00200JPHDML, 2020 WL 4207787, at *9 (S.D. Ind. July 22, 2020) (granting preliminary approval of a settlement in which "[e]ach Class member or the Class member's successor will receive a pro rata share of the Class member's alleged damages based on the net present value damages model that Plaintiffs have maintained is the appropriate method for apportioning damages throughout this litigation, with each recipient receiving a minimum of $500").

Additionally, while the Settlement Agreement also provides for $7,500 Case Contribution Awards for Plaintiffs Regmund Chesser and Janssen, Doc. 206, S.A. at ¶ 9.1, as detailed in Plaintiffs' Motion for Attorneys' Fees, Litigation Expenses, and Case Contribution Awards, courts have endorsed case contribution awards of that modest size as appropriate in class action settlements, and the awards sought here are fully deserved in light of Plaintiffs' efforts. *See Slipchenko,* 2015 WL 338358, at *13.

**E.       The Settlement Class Has Collectively Reacted Positively to the Settlement**

The remaining *Reed* factor is "the opinions of the class counsel, class representatives, and absent class members". *See Reed,* 703 F.2d at 172.   Obviously, the Settlement is endorsed by Plaintiffs' counsel, who collectively have decades of experience in class action litigation and are experienced in oil and gas royalty cases, and the Plaintiffs. *See* Blevins Decl. ¶¶90-92; Kravec Decl. ¶¶53-54. *See Cole*, 2018 WL 2766028, at *5 ("The endorsement of class counsel is entitled to deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims.") (quoting *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 292 (W.D. Tex. 2007)).   As discussed above, since the time of the Court's Preliminary Approval Order, there have been no objections to date and less than 1% of the Settlement Class affirmatively chose to exclude themselves.   This state of affairs suggests that this *Reed* factor will strongly favor approval, but of course the Court may consider the nature and extent of any forthcoming objections, if any, at the Final Fairness Hearing.

**III.       The notice and opt-out process was the best practicable under the circumstances.**

Rule 23(c)(2)(B) requires that class members receive "the best notice that is practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(b).  This notice must include: (1) "the nature of the action," (2) "the definition of the class certified," (3) "the class claims, issues, or defenses," (4) "that a class member may enter an appearance through an attorney if the member so desires,"

(5) "that the court will exclude from the class any member who requests exclusion," (6) "the time and manner for requesting exclusion," and (7) "the binding effect of a class judgment on members." Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).

When the Court granted preliminary approval, it found that "the Notice of Settlement to the Settlement Class . . . is the best notice practicable under the circumstances, constitutes due and sufficient notice to all persons and entities entitled to receive such notice, and fully satisfies the requirements of applicable laws, including due process and Federal Rule of Civil Procedure 23." Doc. 221 at 9. The evidence and law continue to support those findings and the conclusion that the Class Notice meets the Rule 23 requirements.

The Notice of Settlement that the Court preliminarily approved and was disseminated meets all seven of Rule 23(c)(2)(B)'s requirements. *See* Doc. 206-4, S.A., Exhibit 4, Notice. Further, it was modeled after the illustrative notice recommended by the Federal Judicial Center, *see id.*, which has been endorsed by district courts. *E.g.*, *DeHoyos*, 240 F.R.D. at 303 (approving notice over objections in part because it was "consistent with the illustrative notices promulgated by the Federal Judicial Center"). Importantly, it described how payments to Participating Class Members are calculated, and further informed them that they could access the Internet website dedicated to this Settlement for an approximation of their potential recovery or contact Plaintiffs' Counsel for additional information. It further apprised Class Members of the pendency of the Litigation, the Settlement, their right to exclude themselves from the Settlement, their right to object to the Settlement or any part thereof, and their right to appear at the Final Fairness Hearing. Doc. 206, S.A., Exhibit 4, Notice. Thus, Class Members were well armed with the information required to make an informed decision about whether to remain in the Settlement or to exercise their right to opt-out.

Additionally, the method of notice complies with Rule 23 and due process.   As contemplated by the Settlement Agreement, the Settlement Administrator mailed the Notice of Settlement by first class mail to all Class Members who were identified through reasonable efforts no later than 21 days after the Court preliminarily approved the Settlement.   Doc. 206, S.A. at ¶ 5.3; Trani Decl. ¶ 5; Blevins Decl. ¶71-72.   To effectuate this effort, Talisman provided the names and last known addresses of all Royalty Owners in the Settlement Class, which the Settlement Administrator used or located updated addresses for purposes of mailing notice.   Doc. 206, S.A. at at ¶¶ 4.1 & 5.2, 5.3; Trani Decl. ¶ 5; Blevins Decl. ¶71.   Contemporaneous with mailing the first Notice of Settlement and continuing through the date of the Final Fairness Hearing, the Settlement Administrator has also displayed on an Internet website dedicated to this Settlement the following documents: (a) the Notice of Settlement, (b) the First Amended Complaint, (c) the Settlement Agreement with exhibits, (d) the Preliminary Approval Order, (e) the Heirship Form, and (f) Answers to Frequently Asked Questions.   Doc. 206, S.A. at ¶ 5.3; Trani Decl. ¶ 6; Blevins Decl. ¶71.[9]

Looking backwards, it is clear that this process worked as intended.   The class website garnered over 500 page views.   Trani Decl. ¶ 6.   And the Settlement Administrator and Plaintiffs' Counsel fielded more than 180 telephone calls regarding the Settlement Agreement.   Trani Decl. ¶ 6; Blevins Decl. ¶ 72.   These efforts resulted in just 26 of the 2780 Class Members opting out— *i.e.*, less than 1% of the Settlement Class.   Trani Decl. ¶ 7.   Thus, the notice and opt-out procedure were not only calculated to be the best practicable, but the *post hoc* evidence shows that they

---

[9] In addition, on October 19, 2020, Talisman caused the Notice of Settlement to be served on the appropriate state official for each state in which a Class Member resides, and the appropriate federal official, as required by and in conformance with the form and content requirements of 28 U.S.C. § 1715. Declaration of Jason A. Newman attached hereto at Exhibit E.

actually were remarkably efficient.

This approach provided the "best notice practicable" to Settlement Class Members. *See Reedy SBMC Healthcare, L.L.C. Blackwell v. SBMC Healthcare, L.L.C.*, No. 4:12-CV-01324, 2013 WL 12157165, at *1 (S.D. Tex. Mar. 7, 2013) ("Notice . . . by first class mail, postage prepaid, at their last known addresses [of class members] is reasonable and the best notice practicable under the circumstances."); *see also Kemp v. Tower Loan of Miss., LLC*, No. 3:15-CV-499-CWR-LRA, 2017 WL 6522323, at *4 (S.D. Miss. Dec. 20, 2017) ("Notice program [that] consisted of a direct mailing of the Class Notice to all identifiable Settlement Class Members . . . was the best practicable notice under the circumstances and . . . constitutes due and sufficient notice to all persons entitled to notice of the class action settlement."); *In re Prudential-Bache Energy Income Partnerships Securities Litigation*, No. CIV. A. MDL-0888, 1995 WL 8007, at *2 (E.D. La. Jan. 3, 1995) ("Notice by first class mail to individual class members generally satisfies the requirements of Rule 23(c)(2) as 'the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort'" (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173-75 (1974))).

## IV.  The Plan of Allocation should be approved in order to effectuate the Settlement Agreement.

The Court should also finally approve the proposed Plan of Allocation.  *See* Doc. 206-1. Part of the final-approval process is assessing and approving the plan of allocation as fair and reasonable.  *See In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1262 (D. Kan. 2006). Where, as here, a plan of allocation is formulated by competent and experienced class counsel, the plan need only have a rational basis.  *Id.*  As a general rule, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable, especially when allocation is based on a pro rata distribution.  *Id.*

26

Here, the Plan of Allocation directly effectuates the Settlement Agreement's fair and reasonable terms.  As explained above, the Plan of Allocation incorporates the EOS Model, which uses a compositional allocation methodology to determine each Participating Class Member's individual underpayment of royalties.  Doc. 206-1, S.A., Exhibit 1, Plan of Allocation at ¶ 3.  The money allocated to each Participating Class Member as a percentage of the total fund available to all such Class Members will be proportional to the value of that Class Member's underpayment as a percentage of total underpayments.  *Id.*  In addition, each Class Member will receive a minimum $150 payment, and the funds needed to pay for those minimum payments will be borne proportionally by all Participating Class Members that stand to recover $200 or more.  *Id.* at ¶ 5(b).

The Court has already "preliminarily approve[d] the . . . Plan of Allocation" as fair and reasonable.  Doc. 221 ¶ 6.  It should now grant it final approval and thereby permit the Settlement Agreement to be effectuated in full.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs and Plaintiffs' Counsel respectfully request that the Court enter an order granting final approval of the Settlement Agreement, including the form and manner of Notice of Settlement and the proposed Plan of Allocation attached thereto.

Respectfully Submitted,

By:  /s/ *Bryan O. Blevins, Jr.*
Bryan O. Blevins, Jr.
State Bar No. 02487300
Southern District of Texas ID:  347439
**PROVOST★UMPHREY LAW FIRM, L.L.P.**
490 Park Street
Beaumont, Texas 77701
Telephone: (409) 838-8858
Facsimile: (409) 813-8610
Email:  bblevins@provostumphrey.com

W. Michael Hamilton (TN 10720)
**PROVOST★UMPHREY LAW FIRM, L.L.P.**
Hobbs Building, Suite 303
4205 Hillsboro Road
Nashville, TN 37215
Telephone: (615) 297-1932
Facsimile: (615) 297-1986
Email:  mhamilton@provostumphrey.com

Joseph N. Kravec, Jr. (PA 68992)
Wyatt A. Lison (PA 90030)
**FEINSTEIN DOYLE PAYNE**
  **& KRAVEC, LLC**
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007
Email:  jkravec@fdpklaw.com
  wlison@fdpklaw.com

***ATTORNEYS FOR PLAINTIFFS AND THE***
***PROPOSED SETTLEMENT CLASS***

## CERTIFICATE OF SERVICE

I certify that the foregoing Memorandum of Law in Support of Class Representative's Motion for Final Approval of Class Action Settlement was served via the Court's Electronic Filing System to all counsel of record this 12th day of April, 2021.

*/s/ Bryan O. Blevins*
Bryan O. Blevins